# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN HUGH GILMORE, | Civil No.  13-1019 (JRT/FLN) |
| Plaintiff, | |
| v. | |
| CITY OF MINNEAPOLIS, DEITAN DUBUC, JOSHUA STEWART, THOMAS RYAN, GREGORY KOSCH, and MARK LANASA, | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

Mark R. Miller, **MARK R. MILLER, PLLC**, 2885 Knox Avenue South, Suite 406, Minneapolis, MN  55408, for plaintiff.

Sarah C. S. McLaren and Brian Scott Carter, Assistant City Attorneys, **OFFICE OF THE MINNEAPOLIS CITY ATTORNEY**, 350 South Fifth Street, Room 210, Minneapolis, MN  55415, for defendants.

Plaintiff John Huge Gilmore ("Gilmore") is an attorney and political blogger in Minnesota.  Following an altercation with a group of people in downtown Minneapolis in June 2011, Minneapolis police arrested Gilmore and charged him with disorderly conduct and obstruction of the legal process.  Gilmore brings this action against the city of Minneapolis and the officers involved (collectively, "defendants" or "the city"), alleging that the officers violated his First and Fourth Amendment rights by tearing up his poster, and that they violated his Fourth and Fourteenth Amendment rights, and state law, by falsely arresting him.  The city brought a motion for summary judgment.  Because a material factual dispute remains as to Gilmore's Fourth Amendment destruction-of-property claim, the Court will deny summary judgment as to that claim.  Because the

officers are entitled to qualified immunity, or official immunity, as to Gilmore's remaining federal and state claims, and because Gilmore has failed to show that any harm he did incur was caused by a failure to discipline on the part of the city, the Court will grant the city's motion for summary judgment as to Gilmore's remaining claims.

## BACKGROUND

### I.   GILMORE'S DETAINMENT AND ARREST

Gilmore is a prominent political blogger and attorney in Minnesota.  He is active on Twitter and other social media and runs a blog called Minnesota Conservatives.  His allegations in this case arise out of an incident that occurred in downtown Minneapolis on the evening of June 16, 2011.  (Third Am. Compl. ¶ 9, Nov. 20, 2013, Docket No. 20.) Gilmore alleges that he was eating dinner with friends at a restaurant when two Minneapolis police officers, Deitan Dubuc and Joshua Stewart, approached him and asked if he would step outside with them to answer some questions.  (Id. ¶ 10; Decl. of Mark R. Miller ("Miller Decl."), Ex. A (John H. Gilmore Dep.) at 64, 67-69[1], May 1, 2014, Docket No. 49.)  When Gilmore asked the officers what their purpose was, he alleges that they "physically manhandled him out of the booth and dragged him" outside. (Third Am. Compl. ¶ 11; Miller Decl., Ex. A at 68-71.)

The city contends that the officers responded that night to a 911 call.  Upon their arrival, following an on-site conversation with an observer, Matthew Glazer, they

---

[1] Unless otherwise noted, the Court will use the CM/ECF pagination when referring to sources in the record.  Because the depositions in this case display four deposition pages on each single page on CM/ECF, the Court will use the deposition pagination when referring to depositions excerpts.

approached Gilmore in the restaurant.  (*See, e.g.*, Decl. of Joshua Stewart ("Stewart Decl.") ¶¶ 3-5, July 1, 2014, Docket No. 66; Decl. of Deitan Dubuc ("Dubuc Decl.") ¶¶ 3-9, July 1, 2014, Docket No. 67.)  They asked to speak with him, Gilmore refused, and they consequently placed a wrist lock on his left wrist to force him to leave.  (*See, e.g.*, Stewart Decl. ¶¶ 7-9; Dubuc Decl. ¶¶ 9-11.)  The officers believed Gilmore was intoxicated; Gilmore claims that while he did have three to four glasses of wine that night, he did so over the course of four hours and was consequently not intoxicated.  (Dubuc Decl. ¶ 9; Decl. of Brian Carter ("Carter Decl."), Ex. A (John H. Gilmore Dep.) at 120, July 1, 2014, Docket No. 64.)

The officers then handcuffed Gilmore and placed him in the back of a squad car, where he sat for approximately thirty minutes.  (Third Am. Compl. ¶ 12; Miller Decl., Ex. A. at 71:15-72:3.)  Gilmore claims that he attempted, initially, to talk with the officers, but that they ignored him and gave him no opportunity to explain himself.  (Miller Decl., Ex. A at 71:20-73:5.)  The officers returned to the car and first told Gilmore he was free to leave if he left the downtown Minneapolis area.  (Third Am. Compl. ¶ 13; Miller Decl., Ex. A at 73-74.)  However, after communicating with their sergeant, Thomas Ryan, at police headquarters via radio, they then told Gilmore that they would instead be taking him to jail for "disorderly conduct" and "interference with lawful process."  (Third Am. Compl. ¶ 14; Miller Decl., Ex. A at 74:20-75:21.)

The city counters that Gilmore refused to give any information to them and was subsequently handcuffed and placed in the squad car while they continued their investigation by interviewing witnesses.  (Dubuc Decl. ¶ 12.)  The city contends that the officers made no call to their sergeant and that, if they did discuss setting him loose if he

- 3 -

left Minneapolis, it was only as a means to gauge whether he should be booked (i.e., whether he continued to pose a threat).  (Carter Decl., Ex. B (Joshua Stewart Dep.) at 97-100; Carter Decl., Ex. C (Deitan Dubuc Dep.) at 85-86.)  The officers believed booking Gilmore, in lieu of a formal citation, made the most sense because they believed he was intoxicated and would not leave the scene otherwise.  (Dubuc Decl. ¶ 25.)

Gilmore was transferred to a transport vehicle and, while inside and awaiting transport to the jail, Gilmore saw an officer rip up and throw away a political sign bearing the name of his website that Gilmore had with him at the restaurant.  (Third Am. Compl. ¶ 16; Miller Decl., Ex. A at 78:17-82:18.)  Gilmore complained about the sign to Officers Gregory Kosch and Mark LaNasa, who were both in the front of the transport vehicle. (Third Am. Compl. ¶ 17; Miller Decl., Ex. A at 81:23-82:3.)  Gilmore alleges that one officer told him he should take up the issue at the police station.  (Third Am. Compl. ¶ 17; Miller Decl., Ex. A at 82:2-82:3.)  The officers say they have no memory of the sign being destroyed and also note that it is not possible for a prisoner in the back of a police transport vehicle to communicate with officers sitting in the cab of the vehicle.  (Carter Decl., Ex. E (Gregory Kosch Dep.) at 33; Carter Decl., Ex. F (Mark Raymond LaNasa Dep.) at 66-68.)  In his deposition, Gilmore labeled the value of the sign "de minim[i]s." (Miller Decl., Ex. A at 35:19.)

Gilmore was taken to the Hennepin County jail, where his photo was taken and his personal belongings were inventoried.  (Third Am. Compl. ¶ 23.)  He was released from jail the next morning on $50 bail, and in March 2012, the City of Minneapolis dropped all charges against him.  (Third Am. Compl. ¶¶ 23, 26; Decl. of Mark R. Miller ("Second Miller Decl."), Ex. A (John H. Gilmore Dep.) at 89-90, July 18, 2014, Docket No. 73;

- 4 -

Miller Decl., Ex. 25 (Letter to Jamila Boudlali from Assistant City Att'y Sarah Becker) ("I am writing to inform you that I will be dismissing the above-captioned matter against defendant John Gilmore.").)

## II.    CONFLICTING ACCOUNTS OF THE EVENTS LEADING UP TO DETAINMENT AND ARREST

In his third amended complaint, Gilmore alleges that prior to dinner on June 16, 2011, he had been at a political gathering of "Right Online" with other conservative activists, featuring the now-deceased conservative activist and celebrity, Andrew Breitbart.  (Third Am. Compl. ¶ 18; Miller Decl., Ex. A at 33.)  When Gilmore was walking from the gathering to the restaurant he passed several women[2] he believed to be Muslims, all of whom were wearing hijab, and asked them "their opinion of Ayaan Hirsi Ali, the world's preeminent human rights activist on behalf of women in Muslim countries."  (Third Am. Compl. ¶ 18; Miller Decl., Ex. A at 39-40, 45, 52)  Gilmore claims that the women responded that they hated Ali and wished she was dead, so he decided to engage them in conversation – communicating with them about Western, pro-democratic values, but not saying anything offensive or judgmental.  (Miller Decl., Ex. A at 45-54.)

Gilmore alleges that shortly after that conversation began, "a flash mob started to form" comprised of political activists who were attending the Netroots Nation conference in Minneapolis.  (Third Am. Compl. ¶ 19; Miller Decl., Ex. A, Gilmore Dep., at 50-64.) Gilmore alleges that he was "suddenly surrounded by aggressive, yelling, abusive

[2] The officers identified two women whom Gilmore approached: Jamila Boudlali and Anwar Hijaz.  (Dubuc Decl. ¶ 15.)

activists," and although "[h]e engaged on matters political for a short time," he "began to fear for his personal safety," and after several attempts was "able to escape from the threatening mob." (Third Am. Compl. ¶¶ 20–21; Miller Decl., Ex. A at 50-64.) He believed the mob was using tactics of the liberal organizer, Saul Alinsky, to surround him and force him to touch members of the mob, so they could claim assault or battery. (Miller Decl., Ex. A at 54-57.) To escape, and to protect himself, he pretended to make a phone call to Breitbart and to videotape the activists with his Blackberry mobile phone. (*Id.* at 57-64.) After he escaped, he then joined his friends for dinner at a nearby restaurant, until Minneapolis police "burst in[]" and detained him, as described above. (Third Am. Compl. ¶¶ 9-10.)

The city paints a starkly different picture of Gilmore's role in the altercation. The officers first received a 911 call that a suspicious white male wearing all black and sandals, and with gray hair, was yelling at people on the street, shouting racial slurs, and taking photos of the people he was targeting. (Stewart Decl. ¶ 3.) The officers arrived and spoke to Glazer, who told them about the incident, claimed that Gilmore had tried to assault him, and stated that he thought Gilmore would try again to hurt him. (*Id.* ¶ 4.) After entering the restaurant and detaining Gilmore in the squad car, the officers interviewed several witnesses. (*Id.* ¶ 11.)

First, Elisabeth Geschiere told Stewart that after Gilmore engaged the two women regarding Ms. Ali, they responded simply by saying that while they did not like her, they could "agree to disagree" with Gilmore. (*Id.* ¶¶ 12-14.) Gilmore, however, became angry, aggressively walked toward the women, took their photo with his mobile device,

asked why they had come to the United States, and declared that "this is America."  (*Id.*
¶¶ 13-14.)  Geschiere was afraid Gilmore would hurt someone at the scene.  (*Id.* ¶ 14.)

Stewart and Dubuc spoke again with Glazer, who stated that he told Gilmore to
walk away and asked Gilmore if knew the difference between assault and battery, to
which Gilmore responded, "I have not hit you yet but just wait."  (*Id.* ¶ 15 (internal
quotation marks omitted); Decl. of Matthew Glazer ("Glazer Decl.") ¶ 7, July 1, 2014,
Docket No. 68.)   Glazer then became "very afraid that Gilmore was going to assault
him," or that Gilmore would assault the women whom he first approached, and
consequently called 911.  (Stewart Decl. ¶ 15; Glazer Decl. ¶ 7; Dubuc Decl. ¶ 24.)

Dubuc spoke with Boudlali and Hijaz.  (Dubuc Decl. ¶ 15.)  Hijaz said that she
told Gilmore she did not like Ali, but then told him they "would agree to disagree."  (*Id.*
¶ 16.)  Hijaz said Gilmore appeared angry and walked toward her, asking "Why did you
come to my country and try to change us?  You're in the west here."  (*Id.* ¶ 17 (internal
quotation marks omitted)).  Hijaz said she was fearful, almost started crying, and was
physically shaking.  (*Id.* ¶ 18.)  Boudlali said she was shaking and "froze" due to
Gilmore's aggressive advances.  (*Id.* ¶ 19 (internal quotation marks omitted)).  Hijaz
claims Gilmore attempted to approach them multiple times, took photos of them, and
yelled that he "could do whatever he wanted because he was in America."  (*Id.* ¶ 21.)

Gilmore's friend, Paul Carlson, said he could not hear what was being said
between Gilmore and the group, because he was across the street, but that Gilmore was
eight to ten feet away from the group with his hands in his pockets.  (Stewart Decl. ¶ 16.)
Following the interviews, the officers had Glazer fill out a citizen's arrest form.  (Glazer
Decl. ¶ 8; Stewart Decl., Ex. 1 (Certificate and Decl. of Arrest by Private Person).)

## III.   GILMORE'S CLAIMS

In part due to his notoriety and political activism, and the controversial and disputed events that led up to his detainment, Gilmore's arrest received media coverage in the Twin Cities.[3]  Gilmore alleges that the negative publicity that surrounded the arrest initially, which preceded the city's decision to drop the charges, has permanently damaged his reputation.  (Second Miller Decl., Ex. A at 113-14, 173-75.)  Indeed, Gilmore notes that the officers' actions created a false and disparaging narrative about him in the community that will not ever be corrected, because of the permanence of stories and posts on the internet.  (Third Am. Compl. ¶¶ 27-29.)

Gilmore alleges that Officers Dubuc and Stewart,[4] and Sergeant Ryan, in their individual and official capacities,[5] and the City of Minneapolis by reason of a policy, custom, or practice, violated his federal constitutional rights and Minnesota law.  (Third Am. Compl. ¶¶ 30-40.)  In Counts I through III, under 42 U.S.C § 1983, Gilmore alleges

---

[3] *See, e.g.*, Jessica Lussenhop, *John Hugh Gilmore, Minnesota Conservatives blogger, arrested for harassing Muslim women*, City Pages Blogs (June 21, 2011, 12:52 PM), http://blogs.citypages.com/blotter/2011/06/john_hugh_gilmore_harassing_muslim_women.php.

[4] Gilmore's complaint also lists Officers Kosch and LaNasa as defendants.  (*Id.* ¶¶ 30-40.)  Since then, however, he has agreed to voluntarily dismiss them from the suit because they were not involved in his arrest and only transported him to the Hennepin County jail.  (Pl.'s Am. Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Opp'n Mem.") at 29 n.5, Aug. 7, 2014, Docket No. 80.)  Consequently, the Court will grant the city's motion for summary judgment as to LaNasa and Kosch.

[5] The United States Supreme Court has clarified that while "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," "[o]fficial-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (internal quotation marks omitted).  As a result, to the extent the Court grants the city's motion for summary judgment as to the City of Minneapolis, it will also grant summary judgment to the city and dismiss all official-capacity claims against individuals.

violations of his First, Fourth, and Fourteenth Amendment rights, respectively.  (*Id.*
¶¶ 30-38.)   In Count IV, Gilmore alleges that the defendants falsely arrested him in
violation of Minnesota law.  (*Id.* ¶¶ 39-40.)   Gilmore seeks a total of $10 million in
compensatory and punitive damages, along with attorneys' fees and costs.  (*Id.* at 16.)
The city filed a motion for summary judgment on July 1, 2014.  (Defs.' Mot. for Summ.
J., July 1, 2014, Docket No. 61.)

## DISCUSSION

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material
fact and the moving party can demonstrate that it is entitled to judgment as a matter of
law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit,
and a dispute is genuine if the evidence is such that it could lead a reasonable jury to
return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986).  A court considering a motion for summary judgment must view the facts in the
light most favorable to the non-moving party and give that party the benefit of all
reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U .S. 574, 587 (1986).

## II.   HEARSAY

The evidence supporting a summary judgment motion, including the statements or
information contained in affidavits or declarations, should be admissible at trial.  10B
Fed. Prac. & Proc. Civ. § 2738 (3d ed. 2014).  Thus, "inadmissible hearsay evidence"
cannot be considered at the summary judgment stage.  *Brunsting v. Lutsen Mountains*

*Corp.*, 601 F.3d 813, 817 (8th Cir. 2010); *see also Jones v. McNeese*, 746 F.3d 887, 899 (8th Cir. 2014); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993) ("The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.").

Federal Rule of Evidence 802 bars the admission of hearsay. Fed. R. Evid. 802. Rule 801 defines hearsay as a statement, not made "while testifying at the current trial or hearing," and offered "in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).

Gilmore contends that the city impermissibly bases its summary judgment motion on inadmissible hearsay. Specifically, Gilmore challenges the declaration of Minneapolis Police Chief Janae Harteau, noting that the city had ample time to depose her and did not; the declaration of Matthew Glazer, for similar reasons; the statements of witnesses Geschiere, Boudlali, Hijaz, and Glazer, as relayed to and retold by Officers Dubuc and Stewart; and the "unverified and un-notarized" citizen's arrest form attached to Officer Stewart's declaration.[6]

### A.     Use of Declarations

The city has not violated the evidentiary rule simply by using declarations instead of depositions. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration . . . must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Brooks*

---

[6] These unsworn declarations were all made under penalty of perjury, as indicated in each declaration. As a result, they are the equivalent of sworn affidavits or declarations, such as those that are discussed in the cases cited below. *See* 28 U.S.C. § 1746.

*v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111-12 (8th Cir. 2005) (discussing Rule 56 and noting that both affidavits and deposition testimony can be used at summary judgment, so long as both contain, or are supported by, admissible evidence).   As a result, the Court rejects Gilmore's challenge to Minneapolis Police Chief Jane Harteau's declaration, and Glazer's declaration, because both affiants set out facts that would be admissible in evidence and both declarations show that the affiants are competent to testify to the matters stated.   Fed. R. Civ. P. 56(c)(4).   Indeed, Harteau has first-hand knowledge of the Minneapolis police force and its practices and is competent to testify as to them, and Glazer has first-hand knowledge of what occurred on the night in question and is consequently competent to testify to those events.   (Decl. of Jane Harteau ("Harteau Decl.") ¶¶ 9-38, July 1, 2014, Docket No. 65; Glazer Decl. ¶¶ 3, 7); *see Brooks*, 425 F.3d at 1111.   To the extent Glazer's declaration includes third-party statements by Gilmore, those statements are an admission by party opponent and are not hearsay.   Fed. R. Evid. 801(d)(2).

## B.     Third-Party Statements

Gilmore also challenges the third-party of statements of Geschiere, Boudlali, Hijaz, and Glazer that are contained in the Stewart and Dubuc declarations.   (Stewart Decl. ¶¶ 12-15; Dubuc Decl. ¶¶ 15-24.)   Those statements are not hearsay as they are used in this proceeding, however, because they are not being offered for the truth of the matter asserted.   Fed. R. Evid. 801(c)(2) (defining hearsay as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement"); *Brooks*, 425 F.3d at 1111 (explaining, in response to the plaintiff's reliance on a store-owner witness's

affidavit containing statements made to the witness by customers about debris being on a road, that the witness "had first hand knowledge of what customers told him about debris on the road but not of the truth of what they told him"). In the cases Gilmore cites, the affidavits or reports that are barred from consideration contain statements offered for the truth of the matter asserted.

In *Moore v. Indehar*, for example, the plaintiff alleged that a police officer intentionally seized him, in violation of the Fourth Amendment, by firing his weapon at him. 514 F.3d 756, 760 (8th Cir. 2008). The officer's defense was that he was actually targeting someone else and therefore did not intend to shoot the plaintiff. *Id.* The plaintiff supported his allegation by pointing to a police report in which the police officer's supervisor states that the officer was shooting at two people, not just the one person the officer claims he was targeting instead of the plaintiff. *Id.* at 760-61. In other words, the plaintiff introduced the report for the truth of the matter asserted in the report: that the officer shot at both the plaintiff and another person and therefore did intentionally shoot the plaintiff. *Id.* As a result, the Eighth Circuit affirmed the district court's decision not to consider that evidence, because it was inadmissible hearsay. *Id.* at 761. Similarly, the report the Magistrate Judge excluded in *Besett v. Hegg* was offered by the plaintiffs to support their argument that the defendants defamed them when speaking with another woman; that report detailed the other woman's understanding of the allegations against the plaintiffs. 890 F. Supp. 2d 1076, 1085-86 (D. Minn. 2012). Again, the hearsay statements in the report were offered for their truth – to show that the defendants did defame the plaintiffs when speaking to a third-party. *Id.*

In contrast, the third-party statements in the officers' declarations in this case are being offered to show why the officers took the action and engaged in the investigation they did, and how they developed probable cause. The statements are not being offered for their truth and are therefore not hearsay. *United States v. Tenerelli*, 614 F.3d 764, 772 (8th Cir. 2010) ("[A]n out of court statement is not hearsay when offered to explain why an officer conducted an investigation in a certain way."); *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) ("[O]fficials may rely on hearsay statements to determine that probable cause exists."); *Ratliff v. City of Shannon Hills*, No. 4:13-CV-00167 (KGB), 2014 WL 4662327, at *3 (E.D. Ark. Sept. 16, 2014) ("As for the dispatcher's statements recorded by [the officer], those statements are not hearsay because they are not offered for the truth of the matter asserted but to show their effect on the 'hearer.' Even if the dispatcher's statements are hearsay, they still are admissible to show probable cause."). Thus, the Court will consider the third-party statements contained in the officers' declaration – not for their truth, but for the effect they had on the officers.[7]

## C.    Citizen's Arrest Form

The Court will also consider the citizen's arrest form. It is attached to a 28 U.S.C. § 1746 declaration of Officer Stewart, who had Glazer fill out the form. (Stewart Decl., Ex. 1.) The arrest form contains a brief description of the incident by Glazer that corresponds to Glazer's declaration, which the Court discussed above. (*Id.*) It contains

---

[7] In addition, to the extent Gilmore challenges Glazer's retelling of Glazer's own statements in Glazer's declaration, those statements are also not being offered for their truth. Fed. R. Evid. 801(c)(2). Any statements by Gilmore in Dubuc and Stewart's declarations are admissions by party opponent and not hearsay. Fed. R. Evid. 801(d)(2).

third-party statements by Gilmore that would be admissible as admissions by party opponent. Fed. R. Evid. 801(d)(2). Stewart explicitly states in his declaration that Glazer completed the form and that "[a] true and correct copy of [the form] is attached as Exhibit 1 to [his] declaration." (Stewart Decl. ¶ 15.); *see also Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635-36 n.20 (8th Cir. 2000) (considering the admissibility of handwritten notes at summary judgment and stating that "[t]o be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e)"). Additionally, since this is not a criminal case, the form is akin to an admissible public record, although it is different than a standard police report because it contains Glazer's claims, not the officers'. *Ratliff*, 2014 WL 4662327, at *3 (noting that police reports are generally admissible in civil, but not criminal, cases). Finally, none of the statements made in the citizen's arrest form – whether from Glazer or Gilmore – are being offered for their truth, but are instead being offered to show that, based on the information they had, the officers are entitled, at a minimum, to immunity on Gilmore's federal and state false arrest claims.

## III.   SERGEANT RYAN

Before delving into the substance of Gilmore's allegations against Dubuc and Stewart, and the city of Minneapolis itself, the Court will briefly consider the case against Sergeant Ryan. Gilmore alleges in his deposition that while Stewart and Dubuc were initially going to let him go free, Ryan directed them to arrest Gilmore. (First Miller

Decl., Ex. A at 74:20-75:2.)   Before the Magistrate Judge in this case, however, Gilmore's attorney reversed course and credited testimony by Dubuc and Stewart that they would generally blame a decision to arrest someone on a sergeant to reduce tension. (Carter Decl., Ex. D at 3-4.)   Gilmore's attorney also noted that Ryan had stated in his deposition that he had never had a call with Stewart and Dubuc regarding their decision to arrest Gilmore.   (*Id.*)   About that testimony, Gilmore's counsel stated, "Officer Ryan was telling the truth."   (*Id.* at 4.)

Nevertheless, in his brief opposing summary judgment, Gilmore still targets Ryan, albeit more narrowly, claiming that by approving Stewart's and Dubuc's police reports, Ryan was "part of [Gilmore's] arrest process and may not be dismissed out."   (Opp'n Mem. at 17-18.)   The Court rejects this argument.   Gilmore effectively concedes that, for the relevant time period during and following Gilmore's arrest, Ryan played little role, if any, in Stewart's and Dubuc's actions.   (Carter Decl., Ex. D at 3-4.)   Indeed, everything Ryan knew about the incident, to the extent he knew anything, was derived from what he learned from Stewart and Dubuc.   And to the extent merely approving the police reports would subject Ryan to liability, Gilmore has failed to demonstrate that Ryan had any knowledge that would lead him – or any reasonable officer – to know the officers lacked probable cause and that the arrest violated Gilmore's Fourth Amendment rights.   Because Ryan played no role in Gilmore's allegedly wrongful arrest, he cannot be held liable and is entitled to summary judgment.   *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (refusing to hold supervising sergeants liable because they did not "encourage[], condone[], or acquiesce[] in the actions of the" offending officers and because it was not "manifest to [the supervising sergeants] that their actions or inactions were very likely to

violate [the plaintiff's] right to be free from unlawful arrest"); *Escalera v. Lunn*, 361 F.3d 737, 748 n.4 (2d Cir. 2004) ("We further note that a police officer can only be liable for a false arrest that occurs outside of his presence if he had reason to know that such a false arrest was likely to occur." (internal quotation marks omitted)); *see also Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995) ("[S]ummary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." (internal quotation marks omitted)).

Moreover, to the extent Gilmore alleges that Ryan failed to intervene to stop a false arrest of Gilmore, the Eighth Circuit has recently held that "outside of the excessive force context, there is no clearly established law regarding a duty to intervene to prevent constitutional violations." *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013). As a result, Ryan is entitled to qualified immunity at a minimum. Additionally, any claim against Ryan in his official capacity, as a supervisor, will be analyzed as a part of Gilmore's broader claim against the city of Minneapolis itself. *See supra* note 5. The Court will grant the city's summary judgment motion as to Ryan.

## IV.   FOURTH AMENDMENT[8]

### A.   False Arrest

A warrantless arrest complies with the Fourth Amendment "if it is supported by probable cause." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). A law enforcement officer has probable cause "when the totality of the circumstances at the

---

[8] In Parts IV, V, and VII, the Court will consider Gilmore's claims against the officer defendants. In Part VI, the Court will consider Gilmore's claims against the City of Minneapolis.

time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'"  *Id.* at 523 (quoting *Fisher v. Wal-Mart Stores, Inc. et al.*, 619 F.3d 811, 816 (8th Cir. 2010)).   The officers contend they had probable cause, or at least reasonable suspicion up until the point of their investigation and Glazer's citizen's arrest of Gilmore, which then gave them definitive probable cause for the remainder of Gilmore's detention.  *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (noting that a *Terry v. Ohio*, 392 U.S. 1 (1968), stop requires that there be a "reasonable and articulable suspicion that criminal activity may be afoot").  Regardless of whether probable cause existed to remove, detain, and arrest Gilmore, however, the parties ultimately dispute whether the officers are protected from Gilmore's Fourth Amendment claim by qualified immunity.

### 1.      Qualified Immunity Standard

Qualified immunity shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether to grant summary judgment on the basis of qualified immunity, the "court states the facts most favorably to the plaintiff[], discounting the [officers]' contrary evidence."  *See Small v. McCrystal*, 708 F.3d 997, 1002 (8th Cir. 2013).   The Court considers whether the facts alleged, "construed most favorably to the plaintiff[]," (1) establish a violation of a constitutional right and (2) demonstrate that the "right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful."  *Id.* at 1003.   "Qualified immunity is

appropriate only if no reasonable factfinder could answer yes to both of these questions."

*Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

Even if, in retrospect, probable cause did not exist to arrest Gilmore, the officers are entitled to qualified immunity if they had "arguable probable cause." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008) (internal quotation marks omitted). Arguable probable cause protects an officer who "arrest[s] a suspect under the mistaken belief that [he] ha[s] probable cause to do so, provided that the mistake is **objectively reasonable**." *Id.* (emphasis added). While the probable cause standard gives law enforcement "room for reasonable mistakes," the qualified immunity standard "affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

## 2. Relevant Criminal Statutes

The first step in the arguable probable cause analysis is to examine the criminal statues pursuant to which Gilmore was arrested. *See Small*, 708 F.3d at 1003 (stating the arguable probable cause standard and proceeding to examine the Iowa unlawful assembly statute with which the plaintiff was charged); *Borgman*, 646 F.3d at 523 (analyzing whether the officers had arguable probable cause by looking first to the Iowa trespassing statute with which the plaintiff was charged). In this case, Gilmore's inmate booking sheet indicates he was arrested due to his alleged violation of Minneapolis's disorderly conduct ordinance and the Minnesota statute violating the obstruction of legal process,

both misdemeanors.  (Miller Decl., Ex. 22 at 1-2.); *see also* Minn. Stat. § 609.02, subd. 3; Minneapolis, Minn., Code of Ordinances § 1.30(a).

Disorderly conduct bars a person from "engag[ing] in, or prepar[ing], attempt[ing], offer[ing] or threaten[ing] to engage in, or assist[ing] or conspir[ing] with another to engage in, or congregat[ing] because of, any riot, fight, brawl, tumultuous conduct, act of violence, or any other conduct which disturbs the peace and quiet of another . . . ."  Minneapolis, Minn., Code of Ordinances § 385.90.  The state statute governing disorderly conduct is slightly different:

> Whoever does any of the following in a public or private place . . . knowing, or having reasonable grounds to know that it will, or will tend to, alarm, anger or disturb others or provoke an assault or breach of the peace, is guilty of disorderly conduct, which is a misdemeanor:
>
> > (1) engages in brawling or fighting; or
> >
> > (2) disturbs an assembly or meeting, not unlawful in its character; or
> >
> > (3) engages in offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others.

Minn. Stat. § 609.72, subd. 1.

The obstruction of legal process statute proscribes a person from "obstruct[ing], hinder[ing], or prevent[ing] the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense . . . ."  Minn. Stat. § 609.50, subd. 1(1).[9]

---

[9] Since Glazer initially told the police officers that Gilmore had tried to assault him and would assault again, (Stewart Decl. ¶ 4), it may be relevant to consider Minnesota's assault statute.  *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (rejecting the rule "that the offense establishing probable cause must be closely related to, and based on the same conduct as, the offense the arresting officer identifies at the time of arrest" (internal quotation marks omitted)); *Shqeirat v. U.S. Airways Grp., Inc.*, 645 F. Supp. 2d 765, 785 (D. Minn. 2009) (noting that there

(Footnote continued on next page.)

### 3.    Relevance of Misdemeanor Arrest In-Presence Requirement

As a preliminary matter, it is important to note that Minnesota law requires an arresting officer to witness a misdemeanor in order to arrest a suspect for it.  Minn. Stat. § 629.34(c).  In this case, the officers did not witness Gilmore commit the misdemeanor of disorderly conduct, although they allege they did witness him commit obstruction of legal process.  (*See, e.g.*, Stewart Decl. ¶¶ 17-18; Miller Decl., Ex. C at 120-21.)  The city contends that Glazer's citizen's arrest of Gilmore satisfies the requirement that the arresting person witnessed the misdemeanor.  Minn. Stat. § 629.37(1).  In any event, the issue of whether the arrest of Gilmore complies with state law does not impact the Court's Fourth Amendment analysis.  "[T]his circuit has not decided" "whether the Fourth Amendment permits a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer."  *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1258 (8th Cir. 2010).

Because the issue is undecided, the officers are entitled to qualified immunity on it, at a minimum.  *See, e.g.*, *Farkarlun v. Hanning*, 855 F. Supp. 2d 906, 923 (D. Minn. 2012) ("It is an unresolved question of whether the Fourth Amendment requires that a crime be committed in the presence of an officer for a valid warrantless misdemeanor arrest to occur, and therefore the officers are entitled to qualified immunity on that

_____

(Footnote continued.)

must be probable cause that "**a** crime was being or had been committed" (emphasis added)).  Misdemeanor fifth degree assault is defined as: "(1) commit[ting] an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflict[ing] or attempt[ing] to inflict bodily harm upon another."  Minn. Stat. § 609.224, subd. 1.

issue."). As a result, in its Fourth Amendment analysis the Court will not consider the fact that the officers were not present to witness Gilmore's alleged misdemeanor.

### 4.    Arguable Probable Cause and Disorderly Conduct

The city appears to concede, by not discussing the charge in its brief, that no qualified immunity exists, and there is a genuine issue of material fact, as to whether the officers had probable cause to arrest Gilmore for **obstruction of legal process**. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 15, 19 n.3, July 1, 2014, Docket No. 63; Defs.' Reply in Supp. of Summ. J. ("Defs.' Reply") at 4 n.1, Aug. 1, 2014, Docket No. 79 ("For this reason, whether there was probable cause to believe that Gilmore committed obstruction of justice is also irrelevant.").) But officers only needed probable cause – indeed, only arguable probable cause – that **some** crime was committed, not necessarily each or any of the crimes charged. *See Shqeirat*, 645 F. Supp. 2d at 785 (noting that there must be probable cause that "**a** crime was being or had been committed" (emphasis added)); *see also Devenpeck*, 543 U.S. at 153 (rejecting the rule "that the offense establishing probable cause must be closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest" (internal quotation marks omitted)).

As noted above, the city contends the officers had reasonable suspicion and probable cause to support their entire detainment of Gilmore. But the Court need not consider those arguments, since the more deferential qualified immunity standard is ultimately at issue. Assuming, without deciding, that the officers lacked reasonable suspicion or probable cause to detain and arrest Gilmore, either initially or following their

investigation and pursuant to Glazer's citizen's arrest, the Court concludes the officers are nevertheless entitled to qualified immunity because they had arguable probable cause to believe Gilmore committed the offense of disorderly conduct throughout his detainment.  First, the officers responded to a 911 call that reported a man, matching Gilmore's physical description, was shouting at people on the street in downtown Minneapolis, using racial slurs, and taking pictures of the people at whom he was yelling. (Stewart Decl. ¶ 3; Dubuc Decl. ¶ 3.)  Second, upon their arrival, the officers spoke with Glazer, who told them that he was afraid of Gilmore, that Gilmore had tried to assault him and had threatened him, and that Gilmore had been screaming racial slurs at two Muslim women.  (Stewart Decl. ¶ 4; Dubuc Decl. ¶ 5.)  Stewart and Dubuc went into a nearby restaurant, at Glazer's direction, and found a man matching the description given on the 911 call and by Glazer: Gilmore.  (Dubuc Decl. ¶¶ 6-7.)

The call and conversation with Glazer are enough to create arguable probable cause to detain and arrest Gilmore.[10]  At a minimum, they are enough to support his initial detention, until the officers could conduct their investigation.  Minneapolis's disorderly conduct ordinance bars "attempt[ing] . . . or threaten[ing] to engage in . . . any riot, fight, brawl, tumultuous conduct . . . or any other conduct which disturbs the peace and quiet of another . . . ."  Minneapolis, Minn., Code of Ordinances § 385.90. Allegations that Gilmore had tried to assault and had threatened Glazer, and had shouted racial slurs at two Muslim women, are sufficient to create arguable probable cause that

---

[10]  In making this determination, the Court must necessarily interpret state and local criminal statutes.  In doing so, the Court looks to Minnesota law and is "bound by the decisions of the Minnesota Supreme Court." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 475 (8th Cir. 2010).

Gilmore threatened to engage in a fight or tumultuous conduct and that he disturbed the peace of two Muslim women. *Id.*

Similarly, the officers had arguable probable cause to arrest Gilmore for disorderly conduct under the state statute, which, among other things, bars a person from engaging in "offensive, obscene, abusive, boisterous, or noisy **conduct** or in offensive, obscene, or abusive **language** tending reasonably to arouse alarm, anger, or resentment in others," when the person knows that such conduct or language "will tend to[] alarm, anger or disturb others or provoke an assault or breach of the peace." Minn. Stat. § 609.72, subd. 1(3) (emphasis added). The allegation that Gilmore tried to assault Glazer is sufficient to generate arguable probable cause that Gilmore was engaging in offensive or abusive conduct. *See In re Welfare of T.L.S.*, 713 N.W.2d 877, 880-81 (Minn. Ct. App. 2006) (concluding that officers had probable cause to arrest a student for disorderly conduct because her loud shrieking of profanities in school arguably amounts to boisterous or noisy conduct). Moreover, allegations that Gilmore shouted slurs at two Muslim women could constitute offensive language that would arouse anger in both women and other passersby. That language, combined with Gilmore's alleged conduct, even more compellingly supports the officers' defense of qualified immunity.[11] *See State*

---

[11] To the extent the officers relied on Gilmore's verbal statements in developing probable cause, Minnesota law is clear that the disorderly conduct statute, as applied to speech, proscribes only "'fighting words' – words 'which by their very utterance inflict injury or tend to incite an immediate breach of the peace.'" *Baribeau*, 596 F.3d at 475 (quoting *In re Welfare of S.L.J.*, 263 N.W.2d 412, 419 (Minn. 1978)). While the Supreme Court has rejected proscriptions on speech that target the content of the speaker's message and the speaker's viewpoint – including a St. Paul, Minnesota ordinance that barred fighting words motivated by bias, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391-92 (1992) (holding that a St. Paul, Minnesota ordinance that barred disorderly speech that was bias-motivated violated the First Amendment) – in certain

(Footnote continued on next page.)

*v. McCarthy*, 659 N.W.2d 808, 811 (Minn. Ct. App. 2003) (concluding that sufficient evidence existed to convict a defendant of disorderly conduct by analyzing both his "fighting words" – yelling profanities at a female spectator – and his disruptive conduct – interrupting a football game, putting his hands on a referee, and refusing to leave when asked). Even at that early stage in their investigation, based on what they knew, it "was objectively reasonable for the officers to think they had probable cause" to arrest Gilmore. *Livers v. Schenck*, 700 F.3d 340, 357 (8th Cir. 2012).

The objective reasonableness of the officers' probable cause determination only increased as they investigated the incident, after detaining Gilmore, by talking again to Glazer, along with other witnesses. In doing so, they heard from others that Gilmore had shouted angrily at and aggressively walked up to two Muslim women, questioned why they had come to this country, taken their picture with his phone, and told Glazer "I have not hit you yet but just wait." (Stewart Decl. ¶¶ 12-15; Dubuc Decl. ¶¶ 16-24.)

---

(Footnote continued.)

contexts, pursuant to a general proscription on disorderly conduct and speech, racial slurs could be construed to be fighting words that inflict injury or incite a breach of the peace. *Chaplinsky v. State of N.H.*, 315 U.S. 568, 572 (1942) ("Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." (internal quotation marks omitted)); *see also, e.g.*, *City of Billings v. Nelson*, 322 P.3d 1039, 1045 (Mont. 2014) ("Racial slurs . . . may be considered 'fighting words.'").

The Court need not determine, however, whether the alleged racial slurs in this case definitively constitute "fighting words." The alleged slurs did not clearly fall outside the category of "fighting words" and the Court is only applying the deferential arguable probable cause standard at this stage. In other words, the question is simply whether the officers' mistake was objectively reasonable and, given that the slurs **could** have been fighting words, the officers were not unreasonable for considering them in their probable cause analysis. Ultimately, the alleged slurs, combined with the rest of the alleged conduct and threats, are enough to show that the officers were objectively reasonable in believing they had probable cause, even if, in actuality, they were mistaken.

Witnesses report that Gilmore's alleged conduct and statements resulted in chaos as bystanders responded and attempted to intervene.  (Dubuc Decl. ¶ 21.)  These allegations are enough to give the officers arguable probable cause that Gilmore violated either the city's disorderly conduct ordinance or the state disorderly conduct statute.  Even a countervailing statement from Gilmore's friend, Paul Carlson – that Gilmore was at one point eight to ten feet away from the two women – is not enough to eliminate the officers' objectively reasonable belief that they had probable cause.[12]

As noted above, this analysis does not mean that what the witnesses said was true. *See Carpenter*, 686 F.3d at 649 ("Although neither [deputy sheriff] witnessed [the plaintiff's alleged threats to first responders], officials may rely on hearsay statements to determine that probable cause exists.").  There is clearly a factual dispute over what happened in downtown Minneapolis that night and the Court expresses no view on whether Gilmore, or the people with whom he interacted, are correct in their recounting.  But, despite Gilmore's arguments to the contrary, what matters in this analysis is not whether Gilmore actually committed a crime, but whether, given what the officers were told by witnesses and Gilmore, they were "objectively reasonable" in thinking they had probable cause to arrest him.  *Livers*, 700 F.3d at 357.  Indeed, under the arguable probable cause standard, the minimum question is whether the officers' mistake is

---

[12] During their investigation, the officers obviously did not talk to every potential witness nor did they talk with Gilmore about his side of the story – which Gilmore contends is because the officers refused to ask, not because of any unwillingness to talk on his part.  In any event, the officers' investigation was sufficiently thorough under applicable Eighth Circuit case law. *Borgman*, 646 F.3d at 523 (requiring, to constitute arguable probable cause, more than a brief investigation that fails to uncover easily available exculpatory evidence); *see also Clayborn v. Struebing*, 734 F.3d 807, 809-10 (8th Cir. 2013) (concluding that arguable probable cause existed, even where there is more the officers could have done to investigate).

"objectively reasonable." *Ulrich*, 715 F.3d at 1059 (internal quotation marks omitted). Given what the officers were told from various witnesses and the language of the disorderly conduct statute and ordinance, the Court concludes that, even if the officers were mistaken in determining that they had probable cause, they were objectively reasonable in that mistake and are consequently entitled to qualified immunity. *Id.*

This case is markedly different than other cases in which courts have concluded police officers were not entitled to qualified immunity when faced with a false arrest claim. For example, in *Newton v. Walker*, the court concluded the officers were not entitled to qualified immunity because, under the plaintiff's version of the facts, he "was calmly walking down a public sidewalk and merely made a comment to a friend while pointing" at a Minneapolis police officer. No. 11-1499, 2012 WL 4856163, at *4 (D. Minn. Oct. 12, 2012). The court stated that it was "at a loss to imagine how [the police officer] could reasonably have believed that he had probable cause to arrest [the plaintiff]." *Id.* It reasoned that while the police officer claimed the facts of the story were dramatically different, that dispute was one of fact that a jury should decide. *Id.* Here, while it is true that Gilmore's version of the events paints a very different picture of his conduct than the witnesses', what matters is the **officers'** probable cause determination. The critical difference between this case and Newton is that, in this case, the officers made their determination based on a 911 call and witness reports. In *Newton*, the officer made a probable cause determination based on his own observations. *Id.* As a result, in this case, the factual dispute is immaterial and what matters is whether the officers were objectively reasonable in their belief, even if mistaken, that probable cause

existed, based on the information they received from witnesses and the 911 call.  *See*

*Carpenter*, 686 F.3d at 649.[13]

        This case is also different than in *Baribeau*, where the Eighth Circuit, interpreting

the same Minnesota disorderly conduct statute, concluded that the police did not have

probable cause to arrest a group of anti-consumerism protestors.  596 F.3d at 478.  The

court first held that the Minnesota Supreme Court's narrowing construction of the

disorderly conduct statute – which holds that the statute only proscribes expressive

language or speech that amount to "fighting words" – also applies to expressive conduct

as well.  *Id.* at 477.   In other words, expressive conduct is only barred under the

disorderly conduct statute if it has an effect similar to fighting words – conduct that

inflicts injury or tends to incite an immediate breach of the peace.  *Id.* at 475, 477.  The

plaintiffs in *Baribeau* were engaged in expressive conduct in order to protest

consumerism: they were dressed as zombies, playing loud music, walking around, and

coming up close to other members of the public.  *Id.* at 471.  The court concluded that the

officer defendants did not have arguable probable cause to arrest the protestors, because

they were engaged in expressive conduct that "did not amount to fighting words."  *Id.* at

478.   In this case, however, Gilmore does claim that all of his alleged conduct and

statements fall under the umbrella of expressive conduct.   Indeed, the reports from

---

        [13]  Similarly, other cases Gilmore cites are inapposite because they involve classic
disputes of fact between the arresting officers and the plaintiff alleging false arrest.  *See, e.g.*,
*Stoner v. Watlingten*, 735 F.3d 799, 801, 803 (8th Cir. 2013).   Another case Gilmore cites is
inapplicable because the facts are completely different; officers arrested the plaintiff for an
outstanding warrant without confirming the existence of said warrant.  *Bechman v. Magill*, 745
F.3d 331, 334-35 (2014).  And *Meehan v. Thompson*, No. 12-17, 2013 WL 3340157 (D. Minn.
July 2, 2013), which Gilmore also cites, was subsequently reversed by the Eighth Circuit.
*Meehan v. Thompson*, 763 F.3d 936 (8th Cir. 2014).

witnesses of Gilmore's threat against Glazer, and angry advances and statements against Glazer and the two women, describe combative, threatening, and disruptive conduct that led to a large crowd of people gathering and attempting to intervene. They do not describe the type of expressive conduct at issue in *Baribeau*.

Gilmore also contends the officers needed **independent** probable cause, aside from the information they gleaned from victims, to justify his arrest. But Gilmore cites no controlling Eighth Circuit case law that supports that proposition. Indeed, several Eighth Circuit cases have held the opposite. *See Clay v. Conlee*, 815 F.2d 1164, 1168 (8th Cir. 1987) ("Clearly, law enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable."); *see also Carpenter*, 686 F.3d at 649; *Borgman*, 646 F.3d at 523 ("Officers may rely on the veracity of information supplied by the victim of a crime." (internal quotation marks omitted)); *Barnes v. Dorsey*, 354 F. Supp. 179, 183 (E.D. Mo. 1973) (victim's report to police gave arresting police "ample probable cause to arrest" the plaintiff). As a result, the Court concludes the officers could rely on statements from Glazer, Boudlali, and Hijaz in developing arguable probable cause.

Finally, Gilmore seizes on the fact that when the officers arrived, he was sitting with friends in a restaurant not engaging in disorderly conduct. Gilmore is correct that this case is an unusual one. An arrest for disorderly conduct – conduct or language that attempts or threatens to engage in a riot, fight, brawl, or tumultuous conduct; or offensive behavior that will tend to alarm, anger, or disturb others – whether constitutionally valid or not, more often takes place as the disorderly conduct is occurring. *See, e.g.*, *Matter of Welfare of M.A.H.*, 572 N.W.2d 752, 755 (Minn. Ct. App. 1997). In this case, of course,

- 28 -

the officers found Gilmore eating dinner with friends at a restaurant. But – setting aside for the purposes of a Fourth Amendment analysis any state law requirements as to law enforcement needing to witness a misdemeanor – Gilmore cites no authority that states Stewart and Dubuc could not develop arguable probable cause for the crime of disorderly conduct, simply because the crime had ended before the officers arrived. From what the witnesses told them, the officers were objectively reasonable in believing that Gilmore had recently committed disorderly conduct. Gilmore cites no authority that states that simply because the disorderly conduct has ended, an offender is no longer subject to arrest. In fact, many courts have concluded that the target of disorderly conduct statutes is the disorderly conduct, and that no retaliatory violence or actual breach of the peace must actually occur at all. *Id.* at 757-58 ("The fact that the target of alleged fighting words does not retaliate is relevant to the question of whether conduct meets the First Amendment standard, but is not determinative."); *see also Gower v. Vercler*, 377 F.3d 661, 670-71 (7th Cir. 2004) (although the victim of "fighting words" did not retaliate with violence, the words could still breach the peace); *People v. Mathers*, No. 3-09-0510, 2011 WL 10457960, at *4 (Ill. App. Ct. Feb. 15, 2011) ("The relevant question is not whether the words at issue actually provoked a violent response from the victim, but whether they were likely to provoke such a response from a reasonable person.").

*Carpenter* is instructive. 686 F.3d at 649. In that case, deputy sheriffs arrived at the plaintiff's ("Carpenter") home, because a dispatcher told them Carpenter had threatened first responders with a baseball bat. *Id.* at 647. The first responders had left the home. *Id.* Carpenter let the deputies enter, but a dispute of fact exists as to whether Carpenter was cooperative or whether he threatened the officers. *Id.* Regardless, the

court concluded the deputies had probable cause based on what the dispatcher told them about Carpenter's threats to the first responders.  *Id.* at 649.  Similarly, in this case, regardless of Gilmore's actions once the officers reached him, they had arguable probable cause to arrest him for disorderly conduct based on the 911 call and their investigation on the scene.[14]  In sum, the Court finds Officers Dubuc and Stewart had arguable probable cause to arrest Gilmore and will therefore grant summary judgment for the city as to Gilmore's Fourth Amendment false arrest claim.[15]

## B.    Destroyed Property

The Fourth Amendment protects "against unreasonable seizures of property." *Dixon v. Lowrey*, 302 F.3d 857, 862 (8th Cir. 2002).  A seizure takes place if "there is

---

[14] To the extent Gilmore might argue that the officers were wrong to take him downtown for booking because they may have previously discussed releasing him if he would leave Minneapolis, the Court concludes that the officers were acting within their discretion and the fact that they may have considered releasing him does not change the fact that they had arguable probable cause for arresting him to begin with.  In other words, any debate the officers had about the best way to process Gilmore after arresting him – either through booking or through citation and release – is immaterial to the Fourth Amendment analysis.

Similarly, to the extent Gilmore relies on Minnesota Rule of Criminal Procedure 6.01, subd. 1(a), which requires an officer arresting someone for a misdemeanor without a warrant to issue a citation and release the person, unless certain conditions are met, that rule is also immaterial to the Fourth Amendment analysis.  *See Adewale v. Whalen*, 21 F. Supp. 2d 1006, 1015 (D. Minn. 1998) ("The procedure described in Minn. R. Civ. P. 6.01 is not a federal right actionable under § 1983.  Thus, even if [the] defendant [] violated Rule 6.01, the violation would not support a § 1983 claim.  Moreover, the Court is not convinced that the fact of detention incident to a misdemeanor arrest violates the Fourth Amendment.")

[15] The Court will also reject Gilmore's Fourteenth Amendment claim.  Although Gilmore addresses each claim separately, courts apply the same standard – the objective reasonableness standard – to false arrest challenges under both amendments.  *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005); *see also Graham v. Connor*, 490 U.S. 386, 388 (1989); *McClennon v. Kipke*, 821 F. Supp. 2d 1101, 1104 (D. Minn. 2011) (noting that a false arrest violates both the Fourteenth and Fourth Amendments because the Fourteenth Amendment incorporates the Fourth Amendment against the states).

some meaningful interference with an individual's possessory interests in that property." *Id.* (internal quotation marks omitted).   If a seizure of property is carried out by law enforcement without judicial authorization, the seizure "is per se unreasonable unless it falls within a well-defined exception to this requirement." *Id.*   Gilmore contends that Officer Dubuc[16] violated his Fourth Amendment property rights by destroying his sign, which listed the name of his website and blog.   (Third Am. Compl. ¶¶ 16-17; Miller Decl., Ex. A at 80-82.)   Gilmore had taken a picture earlier that evening of the conservative activist, Andrew Brietbart, holding the sign.   (Miller Decl., Ex. 27.)   Dubuc disputes that he destroyed the sign and acknowledges that doing so would be wrong. (Second Miller Decl., Ex. B-1 (Deitan Dubuc Dep.) at 113-15.)

In its summary judgment argument, the city does not dispute the established law regarding a seizure of property, nor does it dispute that its officers had no warrant to seize the sign and that no exception applies that would justify the sign's seizure and destruction.   Instead, the city rests its motion for summary judgment as to this claim on the argument that the value of Gilmore's sign is de minimis.   (*See* Miller Decl., Ex. A at 35:17-19); *Nickens v. White*, 536 F.2d 802, 803 (8th Cir. 1976) (rejecting a deprivation of property claim where the property was only a catalogue of office supplies).   But the city overstates the holding of *Nickens*.   The court in that case did not adopt an explicit rule that property of limited value could never be unconstitutionally seized and destroyed.   *Id.* Instead, it merely found that the taking of an office-supply catalogue did not amount to a Fourth Amendment violation.   *Id.*   Here, the property at issue was a sign that features

---

[16] Although in his brief, Gilmore claims he has not specifically identified the defendant who destroyed the sign, during argument he identified Officer Dubuc.   (*See* Opp'n Mem. at 16.)

Gilmore's website and with which the late Breitbart had been photographed.  It is not comparable to the property at issue in *Nickens*, nor does *Nickens* reach as broadly as the city suggests.  As a result, because the city advances no other legal argument for summary judgment and because a factual dispute exists as to whether Officer Dubuc destroyed the sign, the Court will deny the city's summary judgment motion as to Gilmore's Fourth Amendment destruction-of-property claim against Officer Dubuc. Because Dubuc's actions, if proven, would violate Gilmore's clearly established Fourth Amendment rights, Dubuc is not entitled to qualified immunity on that claim.  *Small*, 708 F.3d at 1003.

## V.    FIRST AMENDMENT

Gilmore also alleges that by destroying his political sign, the officers violated his First Amendment right to freely express himself by carrying such a sign.[17]  (Third Am. Compl. ¶¶ 30-32); *see also Cannon v. City and Cnty. of Denver*, 998 F.2d 867, 873-74 (10th Cir. 1993) (concluding that protestors had a clearly established constitutional right to protest with signs that did not contain fighting words).  But Gilmore cites no case law for the proposition that the seizure or destruction of his political sign is a per se violation of the First Amendment.  He notes that both officers acknowledged that the destruction of his sign could infringe on his First Amendment right, but the officers' perception of Gilmore's First Amendment rights does not define the scope of that right.    The

---

[17]  A plaintiff like Gilmore might also assert a First Amendment retaliation claim, contending that his seizure – which he alleges was a false arrest – was in retaliation for lawful exercising of his First Amendment rights.  *See Baribeau*, 596 F.3d at 481.  Gilmore does not appear to make such a claim, however, so the Court will not analyze one.  (Opp'n Mem. at 43-44; Defs. Mem. at 38 n.5.)

destruction of the sign, if it occurred, may have infringed on Gilmore's Fourth Amendment rights, but a different analysis applies to a First Amendment claim.

Gilmore does cite *Snider v. City of Cape Girardeau*, 752 F.3d 1149 (8th Cir. 2014), but that case is distinguishable. In *Snider*, the plaintiff was charged with violating Missouri's flag desecration statute after shredding an American flag with a knife and throwing it into the street. *Id.* at 1154. The prosecuting attorney later discovered, however, that Supreme Court case law had struck down similar flag desecration statutes in the past. *Id.* As a result, he dropped the charges. *Id.* The court affirmed the district court's denial of summary judgment on qualified immunity grounds to the arresting officer, concluding that the officer had violated the plaintiff's constitutional rights and that a long line of Supreme Court case law demonstrated that those rights were clearly established. *Id.* at 1155-56. This case, on the other hand, does not involve the application of an unconstitutional ordinance – targeting a certain type of expressive conduct – still in force despite clear and long-standing Supreme Court precedent. Instead, the officers were objectively reasonable in believing they had probable cause to arrest Gilmore for the general charge of disorderly conduct, given what they had heard from witnesses. Any seizure of his political sign was incidental to that lawful detainment and arrest. Like the plaintiff in *Smithson v. Aldrich*, Gilmore has failed to demonstrate that his clearly established First Amendment rights were violated and the officers are, at a minimum, entitled to qualified immunity. 235 F.3d 1058, 1063 (rejecting the argument that the officers' arrest of the plaintiff for violating the town's sound ordinance was mere pretext for "their disagreement with his statements to the crowd" and concluding that, "even if this pretextual argument were proven at trial, it would not nullify the finding of

probable cause to believe that [the plaintiff] was violating the sound ordinance, nor would it prevent the application of the qualified immunity defense").

## VI.    CITY OF MINNEAPOLIS LIABITLIY UNDER *MONELL*

Gilmore also alleges that the City of Minneapolis has a custom, policy, or practice of failing to discipline police officers for unconstitutional misconduct.[18]   (Third Am. Compl. ¶ 24.)  He relies for this claim on the city's Civilian Police Review Authority ("CRA") (now the Office of Police Conduct Review ("OPCR")), noting that it has sustained hundreds of complaints against city police officers that, when forwarded on to the Chief of Police, have resulted in no disciplinary action.  (*See* Opp'n Mem. at 56 (summarizing CPRA Annual Reports and the percentage of sustained complaints for which officers receive no discipline).)

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage" with the force of law.'"  *Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978) (internal quotation omitted)).  "Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish

---

[18] Although the complaint also alleges the city failed to train its officers, (Third Am. Compl. ¶ 24), Gilmore has abandoned that claim, (*see* Opp'n Mem. at 51-66; Defs.' Reply at 7 n.4).

governmental policy." *Jane Doe A v. Special Sch. Dist.*, 901 F.2d 642, 645 (8th Cir. 1990).  Alternatively, a plaintiff establishes "custom or usage" by:

> (1)  The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2)  Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3)  Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation.

*Id.* at 646 (citing *Harris v. City of Pagedale*, 821 F.2d 499, 504–07 (8th Cir. 1987)).

In addition, a *Monell* claim requires that the plaintiff's federal rights have been violated and that the custom or policy caused the harm.  *Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 722-23 (D. Minn. 2011).  Although Gilmore offers significant evidence regarding the rates of discipline of police officers by the Minneapolis Chief of Police, as compared with complaints sustained by the CRA, Gilmore has largely failed to show that his federal rights have been violated.  Moreover, although the Court will allow his Fourth Amendment destruction-of-property claim to proceed, Gilmore offers no support for the allegation that a failure to discipline Minneapolis police officers has caused the harm he allegedly incurred – the destruction of his political sign.  (*See, e.g.*, Additional Exs. of Mark R. Miller, Ex. 56 (CRA 2012 Second Quarter Report) at 16, July 18, 2014, Docket No. 75 (listing the types of allegations against officers sustained by the CRA, including inappropriate conduct, excessive force, and harassment, and not listing any allegations related to the destruction of property).)  As a result, the Court will grant the city's motion for summary judgment as to Gilmore's *Monell* claim against the City of Minneapolis.

## VII.   MINNESOTA FALSE ARREST

Gilmore alleges that the officers illegally arrested him in violation of Minnesota law.  (Third Am. Compl. ¶¶ 39-40.)  A person is falsely arrested under Minnesota law "if an arrest is made without proper legal authority."  *Baribeau*, 596 F.3d at 481 (internal quotation marks omitted).  A misdemeanor arrest "conforms to Minnesota law as long as police officers have observed conduct giving rise to probable cause to believe that the offense was committed."  *Id.* at 481-82.  Gilmore maintains that the officers lacked independent probable cause to arrest him under either the disorderly conduct or obstruction statutes – an issue the Court already discussed above – and that his arrest violated Minnesota Statute § 629.34, subd. 1(c), which requires an officer to witness a misdemeanor before arresting a person for committing one (the "in-presence" requirement).  The city argues it is entitled to summary judgment on Gilmore's state law claim because the valid citizen's arrest by Glazer alleviates the in-presence requirement and, in any event, the officers are protected by the state's official immunity doctrine.

### A.   Citizen's Arrest

Minnesota Statute § 629.37 allows a private person to make an arrest for a crime "committed or attempted in the arresting person's presence."  Minn. Stat. § 629.37(1).  However, the law requires the private person to "inform the person to be arrested of the cause of the arrest and require the person to submit."  Minn. Stat. § 629.38.  Minnesota law also requires the arresting person to "take the arrested person before a judge or to a peace officer without unnecessary delay."  Minn. Stat. § 629.39.  If the person to be arrested committed a misdemeanor (or is suspected of committing a misdemeanor), the

misdemeanor behavior must have been committed in the presence of the private person effecting a warrantless arrest under Minnesota law.   *State, Lake Minnetonka Conservation Dist. v. Horner*, 617 N.W.2d 789, 794 (Minn. 2000).   Thus, since Dubuc and Stewart did not witness the misdemeanor and therefore could not validly arrest Gilmore under Section 629.34, subd. 1(c)(1), the city relies instead on Glazer's citizen's arrest to validate the arrest of Gilmore under state law.

Gilmore argues that the citizen's arrest was invalid, because Glazer did not adhere to the requirements of the statute by informing Gilmore of the cause of the arrest.   The city contends that Glazer's citizen's arrest was valid, citing *State v. Duren*, 123 N.W.2d 624 (Minn. 1963).   The city also argues, however, that, even if the Court concludes that the citizen's arrest form was invalid and that Gilmore's arrest was illegal under state law, the officers are still entitled to official immunity.

Although *Duren* is over fifty years old, the relevant statues were largely the same at that time.   *Id.* at 630 nn. 1-5.   In *Duren*, A woman was hit by another car and, after the accident, waited for police to arrive without ever talking to the other driver, who also waited.   *Id.* at 626-30.   When the police arrived, she then filled out a citizen's arrest form, again without ever talking to the other driver.   *Id.*   Relevant to this case, the *Duren* court liberally interpreted the requirements of the citizen's arrest statute as follows:

> The above statutes authorize an arrest by a private citizen without warrant for an attempt to commit or the actual commission of a misdemeanor in his presence.   After such an arrest, the only statutory requirements are that the citizen making the arrest inform the person to be arrested of the reason therefor and thereafter deliver him promptly to a magistrate or peace officer.
>
> It is clear from the record that after defendant's arrest by [the private citizen] she in effect delivered him to the police officers present who

already had him in custody and that shortly thereafter the latter, acting on her behalf, advised him of the reasons upon which she had based his arrest, indicative of compliance with the statutory requirements outlined. That such arrest was made by her at the request of the police officers who had arrived after the accident would not affect its validity if § 629.37 were followed.

*Duren*, 123 N.W.2d at 631; *see also United States v. Rambo*, 789 F.2d 1289, 1293 n.5 (8th Cir. 1986) ("Police officers are authorized to take custody of an individual arrested by a private person . . . which means in practice that police officers often are the ones who actually effect the arrest, acting on behalf of the citizen-complainant."). The court went on to reject the citizen's arrest, because the arrest and charge was related to intoxication, but the private person was not aware the defendant was intoxicated, a point that is not relevant to this case, since Gilmore's arrest was based on disorderly conduct of which Glazer was fully aware. *Duren*, 123 N.W.2d at 632. Indeed, Glazer's arrest form explicitly states that Gilmore threatened Glazer with violence – as a result, the Court may infer, pursuant to *Duren*, that Glazer was aware of the wrongful behavior for which Gilmore was arrested. *See Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 769 (Iowa 2002) ("It is sufficient if the citizen detected the commission of the offense through one of his or her senses, such as hearing, sight, or smell.").

As to the officers' decision to book Gilmore, instead of releasing him with a citation pursuant to Minnesota Rule of Criminal Procedure 6.01, the city argues that decision was justified under the exceptions to Rule 6.01. Specifically, the officers were justified in booking Gilmore because he initially refused to give his name, and therefore posed a "substantial likelihood" of not responding to a citation, and that he was likely to commit further criminal conduct due to intoxication. Minn. R. Crim. P. 6.01, subd. 1(a).

This case presents serious and difficult factual and legal questions as to whether Glazer's citizen's arrest was valid and whether the officers had good reason to detain Gilmore under Rule 6.01.   In many cases involving the citizen's arrest statute, the arresting person gives the proper notice directly to the arrestee.   *See, e.g.*, *Keane v. Comm'r of Public Safety*, 360 N.W.2d 357, 359 (Minn. Ct. App. 1984) (noting that the arrest met the statutory requirements because the private person had observed the offending behavior and informed the arrestee of the reasons for the arrest at the police station).   Still, given the liberal interpretation of the citizen's arrest statutes in *Duren*, which is still good law, the citizen's arrest by Glazer may be valid.   Glazer never actually detained Gilmore, but neither did the arresting person in *Duren*.   *Duren*, 123 N.W.2d at 626-32.   The police detained Gilmore prior to Glazer filling out the form, but that sort of pre-citizen's arrest detainment has occurred in other citizen's arrest cases.   *See Keane*, 360 N.W.2d at 358-59 (rejecting an unlawful arrest argument and concluding that a lawful citizen's arrest took place at the police station, even though, prior to the citizen's arrest, the private person had observed a person driving under the influence, followed him to his home, called the police, and the police had detained and transported the person to the police station).   While Glazer himself apparently did not speak to Gilmore about the arrest, both the Minnesota Supreme Court and the Eighth Circuit, as discussed above, have recognized that a citizen's arrest can be carried out by police officers acting on behalf of the arresting private person.   *See also Rambo*, 789 F.2d at 1294.   Whether the police, who had discovered Gilmore eating dinner in a restaurant with friends after the incident had ended, were justified in booking him under the exceptions to Rule 6.01, versus simply issuing him a citation, is an even more difficult question.   As noted above,

however, the Court need not decide with certainty these complex and rarely examined questions of state law.  Instead, the Court will consider whether, assuming the officers arrested Gilmore in violation of Minnesota law, they are entitled to official immunity.

### B.     Official Immunity

Official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong."  *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn. 1991).  "Generally, police officers are classified as discretionary officers entitled to that immunity."  *Johnson v. Morris*, 453 N.W.2d 31, 42 (Minn. 1990).  The purpose of official immunity is to ensure that officers can "perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment." *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006).

The exception for willful and malicious conduct applies only when an officer knows or has reason to know he or she is doing something illegal:

> The defendant must have reason to know that the challenged conduct is prohibited.  The exception does not impose liability merely because an official intentionally commits an act that a court or a jury subsequently determines is a wrong.  Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

*Rico*, 472 N.W.2d at 107 (emphasis omitted).  Willful and malicious are considered synonymous in this context, *see id.*, and "[w]hether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by a jury," *Morris*, 453 N.W.2d at 42.

The Court concludes that the officers are entitled to official immunity.  Although the question of an officer's allegedly willful or malicious conduct is generally sent to a

jury, *id.*, Gilmore presents "no evidence to suggest that the officers' actions were willful or malicious." *Johnson v. Universal Acceptance Corp. (MN)*, No. 10-684, 2011 WL 3625077, at *8 (D. Minn. Aug. 17, 2011) (plaintiffs failed to address the official immunity defense in their briefs).  Unlike the plaintiffs in *Johnson*, Gilmore **has** addressed the official immunity argument.  (*See* Opp'n Mem. at 47-51.)  But, construing in his favor the factual allegations he makes to defeat official immunity – including that the officers believed him to be intoxicated but conducted no tests to discover if he actually was; and that they initially said they would release him if he agreed to leave Minneapolis – the facts still do not offer any support for a claim that Dubuc and Stewart acted willfully and maliciously.  Instead, Gilmore seems ultimately to rest his official immunity argument on conclusory statements that the officers acted willfully and maliciously at every stage of their interaction with him, even if the record does not support those conclusions.  Unlike in *Anderson v. City of Hopkins*, where an officer's statement gave the impression that the officer had acted with malice, there is no evidence of willfulness and malice and the officers are therefore entitled to official immunity.[19] 805 F. Supp. 2d at 724.  Consequently, the City of Minneapolis itself is also protected by vicarious official immunity as to Gilmore's state law claims and the Court will grant summary judgment to the city as to all claims against the City of Minneapolis.  *See Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 508 (Minn. 2006) ("In general, when a public official is found to be immune from suit on a particular issue, his government

---

[19] To the extent Gilmore argues that the citizen's arrest was invalid because Glazer never signed a formal complaint, he cites nothing to support the claim that the lack of a formal complaint would invalidate a citizen's arrest form and render the defendants liable for false arrest under Minnesota law.

employer will enjoy vicarious official immunity from a suit arising from the employee's conduct.").  Finally, because the Court will grant summary judgment to the city on all claims except the Fourth Amendment seizure and destruction-of-property claim – which Gilmore only asserts against Officer Dubuc – the Court will dismiss all defendants except Officer Dubuc in his individual capacity.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the City of Minneapolis's and the Individual Defendants' Motion for Summary Judgment [Docket No. 61] is **GRANTED in part** and **DENIED in part** as follows:

1.      The motion is **DENIED** as to plaintiff's Fourth Amendment seizure-of-property claim.

2.      The motion is **GRANTED** in all other respects as to plaintiff's claims.

3.      Defendants Thomas Ryan, Gregory Kosch, Mark LaNasa, Joshua Stewart, and the City of Minneapolis are **DISMISSED** from this case.


DATED:  March 16, 2015                    s/ John H. Tunheim
at Minneapolis, Minnesota.                 _____
                                           JOHN R. TUNHEIM
                                        United States District Judge