# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2465

_____

John Hugh Gilmore

*Plaintiff - Appellant*

v.

City of Minneapolis; Deitan Dubuc; Joshua Stewart; Sergeant Thomas Ryan;
Gregory Kosch; Mark Lanasa, Police Officers of the City of Minneapolis in both
their offical and individual capacities

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 9, 2016
Filed: September 13, 2016

_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

John Hugh Gilmore appeals the district court's[1] adverse grant of summary judgment on his claims alleging violations of his First, Fourth, and Fourteenth Amendment rights, unlawful arrest under Minnesota law, and an unconstitutional policy under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  We agree with the district court that the officers are entitled to qualified immunity for Gilmore's federal law claims, official immunity for Gilmore's state law claim, and that Gilmore has not made out a claim under Monell.  We therefore affirm the judgment of the district court.

## I. Background

Around 10 p.m. on June 16, 2011, police received a 911 call from Matthew Glazer, reporting a disturbance and a suspicious white male with gray hair, wearing sandals and all-black clothing, on Nicollet Mall.  Glazer stated that the person described was yelling at people on the street, shouting racial slurs, and taking photos of the people he was targeting.  When officers arrived on the scene in response to the 911 call, Glazer flagged them down.  Glazer reported to the officers that a man, who was later identified as John Hugh Gilmore, had asked two women wearing hijabs their opinion of Ayaan Hirsi Ali,[2] and then began screaming racial slurs at them.  Glazer also claimed that Gilmore had tried to assault him, and stated he thought Gilmore would try to hurt him again.  Whether or not Gilmore actually engaged in the conduct described, he does not dispute that this is what Glazer told the officers when they arrived at the scene.

---

[1]The Honorable John R. Tunheim, Chief Judge for the United States District Court for the District of Minnesota.

[2]Ayaan Hirsi Ali is an activist, author, and former politician who calls for a reformation of Islam and is a prominent supporter of women's rights.

-2-

The officers proceeded to The News Room restaurant, where Glazer said Gilmore had gone.  According to Gilmore, approximately five minutes after he arrived at the restaurant, Officers Deitan Dubuc and Joshua Stewart entered and asked to speak to him.  When he refused, they escorted Gilmore out of the restaurant, using a wrist lock to force him to leave.[3]  Gilmore had drunk 3–4 glasses of wine that night, but he says he was not intoxicated.

After they left the restaurant with Gilmore, Officers Dubuc and Stewart sought to gather more information.  According to the officers, Gilmore refused to speak with them about what had happened.  Gilmore, on the other hand, alleges that he was not given an opportunity to tell the officers his side of the story, but that he was cooperative with them.  Based on the information the officers had regarding the events of the evening and the fact that, from their perspective, Gilmore was "mad" and "refused to cooperate," they handcuffed him and placed him in the back of their squad car.

The officers then interviewed several witnesses.  Gilmore's friend, Paul Carlson, said he could not hear what was being said between Gilmore and the group of people he was allegedly yelling at, because he was across the street, but that Gilmore was 8–10 feet away from the group and his hands were in his pockets.  The two women wearing hijabs reported that after they told Gilmore they did not think favorably of Ayaan Hirsi Ali but they "would agree to disagree," Gilmore yelled, "Why did you come to my country and try to change us? You're in the [W]est here." They relayed that Gilmore also made other comments that made them "fearful" and "terrified."  When Gilmore started taking photos of the women, Glazer inserted himself between the women and Gilmore.  Another witness, Elisabeth Geschiere, confirmed the two women's story.  The officers also spoke again to Glazer, who then

---

[3]While Gilmore asserts that he was cooperative with the officers, he does not state that he voluntarily agreed to leave the restaurant when asked.

-3-

filled out a citizen's arrest form on which he indicated that, during the confrontation, he asked Gilmore whether he knew the difference between assault and battery. Gilmore's alleged reply was, "I haven't hit anyone . . . yet. Just wait." Geschiere also expressed fear that Gilmore would hurt someone at the scene. Gilmore disputes the truth of the witnesses' statements, but does not dispute that this was the information given to the officers while he sat in the back of the police car.

Gilmore recounted a different version of events. He asserted that after attending a political gathering, he passed several women wearing hijabs near 11th Street and Nicollet Avenue, and asked them their opinion of Ayaan Hirsi Ali. Gilmore claimed that a "flash mob" of people from a progressive political conference suddenly appeared, surrounded him, and began aggressively yelling. Gilmore said that he pretended to make a phone call to a friend and to videotape the activists with his phone. He said he feared for his safety and was chased down Nicollet Mall before entering The News Room.

Gilmore also alleged that the officers first said they would release him if he agreed to leave the downtown area, and then changed their minds and decided to take Gilmore to jail. Before leaving the scene outside The News Room and while sitting in the police vehicle, Gilmore saw an officer rip up and throw away a political sign bearing the name of Gilmore's website that Gilmore had with him at the restaurant. Gilmore said he complained about the sign to the two officers in the front of the transport vehicle. The officers have stated they have no memory of the sign being destroyed, and further that prisoners in the back of a police transport vehicle have no way to communicate with officers sitting in the cab.

At the police station, Gilmore was charged with disorderly conduct and interference with lawful process, both misdemeanors. Officer Dubuc noted in his supplemental report that Gilmore was booked in part because he was intoxicated, which Gilmore denies, and because Dubuc feared that Gilmore would not comply

-4-

with an order to leave the area and would instead return to the crowd and continue engaging in the allegedly disorderly conduct. Once at the Hennepin County Jail, Gilmore was processed for release. The charges against Gilmore were subsequently dropped.

## II. Discussion

Gilmore contends the district court erred in granting summary judgment on his various claims. Viewing the facts in the light most favorable to the non-moving party, we review the district court's grants of summary judgment de novo. Carpenter v. Gage, 686 F.3d 644, 648 (8th Cir. 2012); Fed. R. Civ. P. 56(a).

## A. Fourth Amendment False Arrest Claim

"Qualified immunity shields government officials from liability and the burdens of litigation in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Snider v. City of Cape Girardeau, 752 F.3d 1149, 1155 (8th Cir. 2014) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To overcome a defendant's claim of qualified immunity, the burden falls on [Gilmore] to show: '(1) the facts, viewed in the light most favorable to [Gilmore], demonstrate the deprivation of a constitutional right; and (2) the right was clearly established at the time of the deprivation.'" Id. (quoting Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010)).

Gilmore alleges first that his arrest was not supported by probable cause. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Borgman v. Kedley, 646 F.3d 518, 522–23 (8th Cir. 2011) (quoting Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005)). A

-5-

law enforcement officer has probable cause "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'"  Id. at 523 (quoting Fisher v. Wal-Mart Stores, Inc., 619 F.3d 811, 816 (8th Cir. 2010)).  If an officer arrests a suspect under the mistaken belief that there is probable cause, arguable probable cause exists "if the mistake is 'objectively reasonable.'"  Id. (quoting Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008)).

Gilmore was arrested for disorderly conduct and obstructing legal process.  Both are misdemeanors under Minnesota law.  See Minneapolis, Minn., Code of Ordinances Title 15 § 385.90; Minn. Stat. § 609.72 subd. 1(3); Minn. Stat. § 609.50, subd. 1(1).  Under Minneapolis's local ordinance, a person may be arrested for disorderly conduct when he "engage[s] in, or prepare[s], attempt[s], offer[s] or threaten[s] to engage in, or assist[s] or conspire[s] with another to engage in, or congregate[s] because of, any riot, fight, brawl, tumultuous conduct, act of violence, or any other conduct which disturbs the peace and quiet of another."  Minneapolis, Minn., Code of Ordinances Title 15 § 385.90.  Gilmore's inmate booking sheet indicates he was arrested under the Minneapolis ordinance, but the state law governing disorderly conduct is slightly different.  Under Minnesota law, a person is prohibited from engaging in "offensive, obscene, abusive, boisterous, or noisy conduct or in offensive, obscene, or abusive language tending reasonably to arouse alarm, anger, or resentment in others," when the person knows that such conduct or language "will tend to[] alarm, anger or disturb others or provoke an assault or breach of the peace."  Minn. Stat. § 609.72 subd. 1(3).

When deciding whether to arrest a subject, "[o]fficers may 'rely on the veracity of information supplied by the victim of a crime.'"  Borgman, 646 F.3d at 523 (quoting Fisher, 619 F.3d at 817); see also Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) ("[A]n officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime . . . .").  "In considering information given by a

-6-

victim of a crime, an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect." Borgman, 646 F.3d at 523  (quoting Kuehl, 173 F.3d at 650). "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence . . . ." Kuehl, 173 F.3d at 650.

Glazer's 911 call and in-person account to the officers would provide probable cause for an arrest for disorderly conduct.  Though Gilmore is correct that there were conflicting versions of events that occurred on the night of June 16, 2011, that fact, on its own, does not establish there was plainly exculpatory evidence available to the officers at or near the time of Gilmore's arrest.  "When an officer is faced with conflicting information that cannot be immediately resolved . . . he may have arguable probable cause to arrest a suspect." Borgman, 646 F.3d at 523 (citing Amrine, 522 F.3d at 832–33).  There was no plainly exculpatory evidence – such as evidence that Gilmore did not fit the description the 911 caller had given, or that Glazer was clearly not a credible witness – that the officers here ignored.  The report of Gilmore's attempting to assault Glazer, and yelling at, taking pictures of, and threatening various other people would give officers at least arguable probable cause for his arrest.  See, e.g., In re Welfare of T.L.S., 713 N.W.2d 877, 880–81 (Minn. Ct. App. 2006); State v. McCarthy, 659 N.W.2d 808, 811 (Minn. Ct. App. 2003).[4]  Based on

───────────────

[4]We recognize that it is a disputed fact whether Gilmore was given the opportunity to relay his version of events to the officers before being placed in handcuffs or in the squad car.  Because we must construe the facts most favorably to Gilmore, we assume the officers failed to ask for his side of the story.  But Gilmore does not argue that he would have said anything that would have negated the arguable probable cause stemming from Glazer's call and in-person account.  Cf. Kuehl, 173 F.3d at 648 (holding officers lacked arguable probable cause because they spoke with the suspect for only twenty seconds, ignored exculpatory evidence, and failed to document a separate eyewitness account in the police report).  The only evidence Gilmore presents as exculpatory here is the fact that his version of events would have conflicted with Glazer's.  That amounts only to "information that cannot be

-7-

the record before us, there was nothing the officers could have immediately discovered that would have exonerated Gilmore by conclusively contradicting Glazer's statement.

Gilmore argues that there was insufficient evidence to charge him with any offense, in part because he was processed for immediate release and videos portraying the incident came to light after the fact and supported his version of events.[5] But "probable cause is determined 'at the moment the arrest was made,' [and] any later developed facts are irrelevant to the probable cause analysis for an arrest." Amrine, 522 F.3d at 832 (quoting United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004)). The evidence Gilmore points to, such as the videos and his processing for immediate release at the police station, was developed after the arrest and is therefore not relevant to the question of arguable probable cause. The city's attempt to put forth later-developed witness statements likewise does not affect the probable cause analysis, and is relevant only to determine whether "minimal further investigation"

immediately resolved." Borgman, 646 F.3d at 523.

Gilmore also notes that the magistrate judge concluded Gilmore had made out a "prima facie case for false arrest," which allowed Gilmore to amend his complaint to include a claim for punitive damages. The judge, however, was not reviewing the record at summary judgment, and that preliminary order does not conflict with a finding of arguable probable cause here.

[5]While an officer may not arrest a suspect if he is "aware of . . . a videotaped account of the crime that conclusively establish[es] the suspect's innocence," there is nothing in the record to establish that any video evidence portrayed the full events at issue, and there is no evidence that the officers here were contemporaneously aware of any videos. Kuehl, 173 F.3d at 650.

-8-

would have exonerated Gilmore.  When the officers detained Gilmore based on the 911 call and Glazer's statement, they had arguable probable cause to arrest Gilmore.[6]

Complicating the situation is the fact that Minnesota law requires an arresting officer to witness a misdemeanor in order to arrest a suspect for it, and Gilmore argues this is independent grounds for concluding his arrest was in violation of the Fourth Amendment.  Minn. Stat. § 629.34(c).  The city contends that Glazer's citizen's arrest satisfied the "in-presence" requirement.  We need not decide whether the citizen's arrest satisfied the "in-presence" requirement in order to resolve Gilmore's Fourth Amendment claim, however, as this circuit has not decided "whether the Fourth Amendment permits a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer."  Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1258 (8th Cir. 2010).  "A constitutional or statutory right is clearly established if '[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Snider, 752 F.3d at 1155 (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  Because the law regarding warrantless misdemeanor arrests for offenses committed outside the presence of the arresting officer is not clearly established under the Fourth Amendment, the arresting officers are entitled to qualified immunity on Gilmore's constitutional claim.  See, e.g., Farkarlun v. Hanning, 855 F. Supp. 2d 906, 923 (D. Minn. 2012).[7]

---

[6]Gilmore argues there was insufficient evidence to suggest he was intoxicated at the time of arrest.  We agree the parties dispute this issue, but the officers arrested Gilmore for disorderly conduct, not public intoxication.

[7]Because Gilmore's arrest for disorderly conduct was lawful under the Fourth Amendment, we need not consider whether the alternate basis of his arrest for obstruction of legal process was valid.  Moreover, the district court did not base its rulings on the obstruction of legal process statute and the city failed to address the obstruction charge in its brief.

-9-

**B. State Law False Arrest Claim**

Gilmore also asserts that his arrest was unlawful under Minnesota state law. The district court determined that the officers were entitled to official immunity on this claim. Under Minnesota law, official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful or malicious wrong." Rico v. State, 472 N.W.2d 100, 106–07 (Minn. 1991). "[T]he conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity." Kelly v. City of Minneapolis, 598 N.W.2d 657, 665 (Minn. 1999) (citing Elwood v. Rice Cty., 423 N.W.2d 671, 678–79 (Minn. 1988)). However, an officer may be guilty of a "wilful or malicious wrong," and excepted from the protections of immunity, when he or she knows or has reason to know he or she is doing something illegal:

> The defendant must have reason to know that the challenged conduct is prohibited. The exception does not impose liability merely because an official *intentionally* commits an act that a court or a jury subsequently determines is a wrong. Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

---

The district court also correctly rejected Gilmore's Fourteenth Amendment claim, as false arrest claims brought under the Fourteenth Amendment are analyzed identically to those brought under the Fourth Amendment. See Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005); Graham v. Connor, 490 U.S. 386, 388 (1989); McClennon v. Kipke, 821 F. Supp. 2d 1101, 1104 n.4 (D. Minn. 2011) (noting that claims of unlawful arrest brought against state actors are analyzed under the Fourth Amendment standard). Gilmore does not contend otherwise.

-10-

Rico, 472 N.W.2d at 107.  In order to overcome the officers' claim of official immunity, therefore, Gilmore must show the officers had reason to know that arresting him was prohibited.  A person is falsely arrested under Minnesota law "if an arrest is made without proper legal authority."  Baribeau, 596 F.3d at 481 (quoting Lundeen v. Renteria, 224 N.W.2d 132, 135 (Minn. 1974)).  Gilmore asserts that, unlike our Fourth Amendment law, there is a clear "in-presence" requirement for misdemeanor arrests in Minnesota.  The "in-presence" requirement means that a misdemeanor arrest "conforms to Minnesota law as long as police officers have observed conduct giving rise to probable cause to believe that the offense was committed."  Id. at 481–82. The officers here are not entitled to official immunity if they had reason to know that the "in-presence" requirement was not satisfied by a citizen's arrest.  Minnesota's state law precedent, however, does not provide any such reason.

Minnesota Statutes § 629.37(1) allows a private person to make an arrest for a crime "committed or attempted in the arresting person's presence."  See also Lake Minnetonka Cons. Dist. v. Horner, 617 N.W.2d 789, 794 (Minn. 2000) (noting application as to misdemeanors).  The private person must "inform the person to be arrested of the cause of the arrest and require the person to submit."  Minn. Stat. § 629.38.  Since Officers Dubuc and Stewart did not personally witness Gilmore's disorderly conduct and therefore could not satisfy the "in-presence" requirement themselves, the city relies on Glazer's citizen's arrest.  Gilmore alleges that the citizen's arrest was invalid because Glazer did not fill out the citizen's arrest form until after Gilmore was handcuffed and therefore arguably already arrested, and because he did not inform Gilmore of the cause of his arrest, as the citizen's arrest statute requires.  See Minn. Stat. § 629.38.

A citizen's arrest may be valid, even if it is an officer who takes custody of the suspect.  In State v. Duren, officers asked a private citizen who had witnessed an

-11-

alleged misdemeanor to sign a citizen's arrest form, because the officers had not witnessed the commission of the offense themselves.  123 N.W.2d 624, 631 (Minn. 1963).  The court noted "[i]t is clear from the record that after defendant's arrest by [the citizen] she in effect delivered him to the police officers present who already had him in custody," and concluded that the fact that "such arrest was made by [the citizen] at the request of the police officers who had arrived after the accident would not affect its validity if § 629.37 were followed."  Id.; see also United States v. Rambo, 789 F.2d 1289, 1293 n.5 (8th Cir. 1986) (noting that under Minnesota law "[p]olice officers are authorized to take custody of an individual arrested by a private person, which means in practice that police officers often are the ones who actually effect the arrest, acting on behalf of the citizen-complainant" (citations omitted)).  The district court concluded that Glazer had witnessed all of Gilmore's relevant behavior, and could effect a citizen's arrest by asking the officers to detain Gilmore after the fact.  See Duren, 123 N.W.2d at 631.  Gilmore also argues that Glazer did not comply with the statutory requirement of "inform[ing] the person to be arrested of the reasons therefor," but Glazer did not need to complete that requirement personally.  Under Minnesota law, the officer could do that on his behalf.  See id. ("[The police officers] already had [the defendant] in custody and . . . acting on [the private citizen's] behalf, advised [the defendant] of the reasons upon which [the private citizen] had based his arrest, indicative of compliance with the statutory requirements outlined.").

Gilmore points to the case of State v. Jensen, arguing that "[t]he purpose of the presence requirement is to prevent warrantless misdemeanor arrests based on information from third parties."  State v. Jensen, 351 N.W.2d 29, 32 (Minn. Ct. App. 1984).  "When the basis of the officer's belief that the defendant has committed a misdemeanor is information imparted to him by, say, victims, witnesses or informers . . . [h]e may not act on his own appraisal of the reasonableness of the information."  Id. (quoting People v. Dixon, 222 N.W.2d 749, 751 (Mich. 1974)).  The problem in that case, however, was the same one that invalidated the arrest in Duren – namely,

-12-

that no one person witnessed all of the elements of the crime. Here, Glazer witnessed everything necessary to arrest Gilmore for disorderly conduct. While the Minnesota case law on the precise contours of a valid citizen's arrest is limited, what law does exist gave the officers no "reason to believe" that the arrest in this case was prohibited. Rico, 472 N.W.2d at 107.

Whether the officers' continued detention of Gilmore pursuant to Minnesota Rule of Criminal Procedure 6.01 was valid is, as the district court noted, "an even more difficult question." Rule 6.01 requires that an arresting officer in misdemeanor cases, proceeding without a warrant, "must issue a citation and release the defendant unless it reasonably appears: (1) the person must be detained to prevent bodily injury to that person or another; (2) further criminal conduct will occur; or (3) a substantial likelihood exists that the person will not respond to a citation." Minn. R. Crim. P. 6.01. "If the officer has already arrested the person, a citation must issue and the person must be released," unless any of the exceptions are present. Id. The officers here stated that Gilmore initially refused to give his name and that they believed he was likely to commit further criminal conduct due to intoxication. Glazer stated that Gilmore had attempted to assault him, and that he was afraid Gilmore might try to hurt him again. Geschiere told one of the officers that she had been afraid that Gilmore would hurt someone at the scene. Gilmore, however, states that he was cooperative, that he was not intoxicated, and that he was not given the opportunity to provide any information on his own behalf. See Minneapolis Police Dep't. v. Kelly, 776 N.W.2d 760, 768–69 (Minn. Ct. App. 2010) (noting "the defendant's attachment to the community and prior history of response to the criminal process are relevant guideposts for . . . a determination" as to whether a defendant will respond to a citation, and arresting officers should investigate and consider such information).

While we conclude that there remain disputed issues of fact regarding whether the officers had reason to know Rule 6.01 made their actions unlawful, another statute, Minnesota Statutes section 629.36, also applies to the facts of this case. In

-13-

contrast to the officers' obligations under Rule 6.01, section 629.36 provides: "When a bystander arrests a person for breach of the peace, the bystander may deliver that person to a peace officer. The peace officer shall take the arrested person to a judge for criminal processing." While this statute leaves us with more questions than it resolves, and precedent from the Minnesota courts analyzing the statute is lacking, it does seem in direct conflict with Rule 6.01, creating confusion as to the officers' statutory obligations under the circumstances. See Gleason v. Metro. Council Transit Operations, 563 N.W.2d 309, 318 (Minn. Ct. App. 1997) (noting official immunity applies when the official demonstrates "that the right allegedly violated was not clearly established, that is, that there was no basis for knowing the conduct would violate the plaintiff's rights"). Rule 6.01 requires release on citation unless certain circumstances exist; section 629.36 seems to require a person be taken into immediate custody, at least for a brief period, by the peace officer. Whether a "bystander" is a citizen for purposes of a citizen's arrest and what is meant by "criminal processing" are not clear from the statute, but that very lack of clarity is what prevents us from concluding that the officers knew or had reason to know that their conduct in continuing to detain Gilmore was prohibited. We have no conclusive reason to believe that Rule 6.01 does not apply to citizen's arrests for misdemeanors, and Gilmore's continued detention may not have been "'objectively' legally reasonable," see Gleason, 563 N.W.2d at 318, but we cannot conclude that Gilmore's arrest was "clearly established" as unlawful given the existence of section 629.36.[8]

The combination of this statute and Rule 6.01 creates potentially odd results: identical misdemeanor conduct could leave an individual either with a citation (or else a false arrest claim) or being taken immediately to a judge for "criminal processing," depending solely on who witnesses the crime and effects the arrest. Yet

---

[8]We note, however, that the officers in this case did not actually comply with the requirements of section 629.36, as Gilmore was never taken before a judge for "criminal processing."

-14-

we must leave that troubling thought to the Minnesota legislature to resolve.  Since we do not believe the officers had sufficiently clear knowledge of what was required of them under the circumstances, neither can we conclude that they acted maliciously or wilfully in violating Gilmore's rights.  See Rico, 472 N.W.2d at 109; see also Gleason, 563 N.W.2d at 318.  As a result, the officers are entitled to official immunity on Gilmore's state law false arrest claim.

## C. First Amendment Claim

Gilmore argues that the district court erred in finding that the officers did not violate his First Amendment right to freely express himself when they destroyed his political sign.  Unlike Snider, 752 F.3d 1149, on which Gilmore relies, this case does not involve the application of an unconstitutional ordinance.  Gilmore was not arrested for displaying his sign or for any message he conveyed by having it.  Instead, he was arrested for disorderly conduct, and the officers seized the sign in the course of that arrest.  Destruction of the sign may implicate other of Gilmore's rights, but he provides no authority for the proposition that the seizure of a political or viewpoint-based sign incident to a lawful arrest is a per se First Amendment violation.  Moreover, he points to nothing that would give officers notice that any such right was clearly established at the time.  Id. at 1155 (stating that whether a right was clearly established at the time of arrest turns on whether "in the light of pre-existing law the unlawfulness [of the officers' conduct was] apparent" (quoting Creighton, 483 U.S. at 640)).   Because Gilmore has failed to show a violation of any clearly established First Amendment right, the officers are entitled to summary judgment on Gilmore's First Amendment claim.  See Smithson v. Aldrich, 235 F.3d 1058, 1063 (8th Cir. 2000).

## D. Property Seizure and Damage

Gilmore also argues that police improperly seized and destroyed his political sign in violation of his Fourth Amendment right to be free of unreasonable searches

-15-

and seizures. Because Gilmore's arrest was not unconstitutional, the seizure of his sign was also valid. See Meehan v. Thompson, 763 F.3d 936, 946 (8th Cir. 2014) ("[A] search incident to [an] arrest requires no additional justification." (second alteration in original) (quoting United States v. Robinson, 414 U.S. 218, 235 (1973))); United States v. Baldenegro-Valdez, 703 F.3d 1117, 1125–26 (8th Cir. 2013); Moreno v. Turner, 572 F. App'x 852, 857 (11th Cir. 2014) (unpublished) ("Because the warrantless arrest was supported by at least arguable probable cause, [the officer] was also entitled to search [the arrestee] incident to arrest."). Moreover, if the seizure was valid, we doubt Gilmore can assert a Fourth Amendment claim over the sign's destruction. See Ali v. Ramsdell, 423 F.3d 810, 814 (8th Cir. 2005) ("We have considerable doubt whether an allegation that property appropriately seized in executing a valid search warrant but not inventoried and stored in the manner required by state law even states a claim under the Fourth Amendment."); Hudson v. Palmer, 468 U.S. 517, 538–39 (1984) (O'Connor, J., concurring) ("[I]f the act of taking possession and the indefinite retention of the property are themselves reasonable, the handling of the property while in the government's custody is not itself of Fourth Amendment concern. . . . [A]ny losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation."). Gilmore therefore has not presented a clearly established right preventing the destruction of his sign under the Fourth Amendment. Furthermore, while a Fourteenth Amendment due process claim for the destruction of property may be an alternative avenue for redress, Gilmore failed to raise such a claim, and we therefore decline to analyze one.

### E. Monell Claim

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage" with the force of law.'" Ware v.

-16-

Jackson Cty., Mo., 150 F.3d 878, 880 (8th Cir. 1998) (quoting Monell, 436 U.S. at 691).  Because Gilmore has failed to show any violation of his federal rights, this claim necessarily fails.  See Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007).

### III. Conclusion

We affirm the judgment of the district court.

BEAM, Circuit Judge, dissenting.

## I.      BACKGROUND

Plaintiff John Hugh Gilmore is an attorney in Minnesota and a recognizable politically conservative blogger and author.  On June 16, 2011, two separate conferences or meetings were being held simultaneously on Nicollet Mall in downtown Minneapolis.

Gilmore attended one gathering called Right Online Conference, intending to later go meet and have dinner with friends.  Matthew Glazer, a resident of Austin, Texas, was attending the other conference on the Mall, identified as NetRootsNation.[9]

As Gilmore was on his way to dinner as planned, he came in contact with two women wearing hijabs, a head covering worn in public by some Muslim women.  A discussion ensued between Gilmore and the hijab-attired women concerning, as noted

---

[9]Although not mentioned by the district court, the record discloses that Mr. Glazer is, indeed, the President and Founder of Progress Texas, a politically liberal Texas-based organization, leading one to suspect that his intervention, as discussed below, was a conservative/progressive political discussion not only protected but encouraged by the First Amendment.

-17-

by the court, Ayaan Hirsi Ali, a third Muslim woman.  Ms. Hirsi Ali is an activist supporter of women's rights, including reformation of traditional Islamic practices. She is also the author of a <u>New York Times</u> bestseller entitled <u>Infidel</u>, a much discussed and debated publication across the religious world.  The women told Gilmore that they disagreed with Ms. Hirsi Ali, seemingly in no uncertain terms.

The discussions between Gilmore and the Muslim women, as reported by Glazer, became heated and Glazer gratuitously intervened on behalf of the hijab-clad women, resolutely demanding that Gilmore should "walk away" from the women. Gilmore responded in kind, telling Glazer he "should walk away."  This prompted Glazer to seek outside support through a 911 telephone call requesting police intervention.  He told the police dispatcher that "a white male with gray hair, who was wearing sandals and all black, was yelling at passersby [the Muslim women] and using racial slurs"–utterances almost always in bad taste but in this case clearly statements protected by the First Amendment, even assuming the statements occurred as claimed.  Glazer also told the dispatcher that Gilmore was "taking photographs" of the people he was communicating with, almost never a criminal offense when done on public occasions in public places.  Since Nicollet Mall may be one of the most, if not the most, public place in the State of Minnesota and the discussion involved a well-known public figure and bestselling author, it is difficult to envision that such photography could be deemed criminal in nature, especially by trained police officers. This information was relayed to two police officers on patrol.  Armed with these reasonably benign facts, they proceeded to the Mall.

When defendant Minneapolis police officers Dubuc and Stewart arrived on the scene via police car, they were hailed by Glazer who repeated to them that Gilmore had been screaming racial slurs at two women wearing hijabs and that he (Glazer) at some later point in time feared that Gilmore would assault him.  The evidence does not disclose the nature of this avowed fear and there is, of course, no evidence that any assault or attempted assault occurred.  Furthermore, Glazer stated under oath that

-18-

he did not inform the officers of this fear of assault until after they had already arrested Gilmore at a restaurant and returned to the Mall.

But, even if the assault claim is at all relevant in this matter, I find no precedent, and the court cites none, supporting the proposition that an alleged "fear" of an assault would have incubated any form of constitutional or other violation by Gilmore–at least under the politically charged circumstances at work in this case.  It is telling that there is also no evidence that Glazer ever informed the police officers of his own intentional, unprovoked, interventionist intrusion into Gilmore's First Amendment-protected discussion with the Muslim women and later with Gilmore.

Between the time of the 911 phone call and arrival of the police, Gilmore had departed from the area to meet his friends at The News Room restaurant as originally planned.  Thus, Glazer was the sole source of information about Gilmore presented to the defendant police officers both through the 911 call and the in-person communications at the Mall prior to Gilmore's unconstitutional arrest at the restaurant.

The record establishes that Officers Dubuc and Stewart split up as they entered the restaurant referred to by Glazer to search for the white male with gray hair wearing all black and sandals.  Dubuc was first to locate Gilmore eating at a table. Dubuc approached Gilmore and without inquiry of any kind, ordered him to accompany Dubuc outside the restaurant.  Gilmore responded, "No I'm good here." Dubuc claims to have repeated his request and that Gilmore stated that he (Gilmore) was a lawyer, knew his rights and stated to Dubuc "you do not have PC" (probable cause).  Dubuc then told Gilmore that if he did not walk out with him, he (Dubuc) "would have to physically remove him from the establishment."  When Gilmore did not submit to this threatened custody, Dubuc states that he applied "a left wristlock and began pulling Gilmore's arm in an upward motion," and Gilmore, submitting to Dubuc's physical acts of custody, was removed from the restaurant and confined in

a police car.  To make his custody more secure, he was placed in handcuffs by the police officers.

Gilmore remained in this custodial arrangement until he was later transferred to a police transport vehicle, taken to Hennepin County Jail and booked for disorderly conduct and obstruction of legal process, both misdemeanors under Minnesota law. He was released from jail the next morning and later all charges were prudently dropped after the prosecutor learned there was a substantial dispute in the facts surrounding the arrest and also some concerns related to the credibility of some of the witnesses.  Prior to the arrest by Officer Dubuc in the restaurant, Gilmore was never asked for his side of the story concerning the events on Nicollet Mall.

As Gilmore was confined in the police car at the Mall as a result of his arrest in the restaurant, the police officers, perhaps realizing the constitutional infirmity of the restaurant arrest, solicited Glazer to prepare, and tutored him in the completion of, a "citizen's arrest form" supplied by them.  And while not relevant to the false arrest at the restaurant, as I will shortly explain, it should be noted that when the police officers, subsequent to the arrest, finally got around to talking to persons at the scene other than Glazer and the co-complainant Muslim women, the officers were approached by an acquaintance of Gilmore's, identified as Paul Carlson.  Carlson informed the police that he observed the alleged confrontation that occurred prior to their arrival and stated that he "could not hear what was being said but [saw] that Gilmore was eight to ten feet away from the group of people [involved] and [Gilmore] had his hands in his pockets."

With regard to the occurrences at the restaurant, the court contends that there "is a disputed fact whether Gilmore was given the opportunity to relay his version of events to the officers before being placed in handcuffs or in the squad car."  Ante at 7 n.4.  There is no evidence of any such dispute, but the issue is irrelevant.  Officer Dubuc states under oath that he arrested Gilmore with the wristlock at the dinner table

-20-

without offering any such opportunity before dragging him to the squad car waiting in the street. Accordingly, it is clear Gilmore was not asked to give "his version of events" prior to the unconstitutional Fourth Amendment violation.

In any event, the court correctly concedes that "[b]ecause we must construe the facts [at issue] most favorably to Gilmore [under the motion to dismiss his claims via summary judgment], we assume the officers failed to ask for his side of the story." Ante at 7 n. 4. And as the court further states "[i]n considering information given by a victim of a crime, an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' [like seeking the potential arrestee's side of the story] if it would have exonerated the suspect." Ante at 6-7 (quoting Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011)).

Here, the only purported victims of a crime prior to the arrest were Glazer and, possibly, the Muslim women. Thus, minimal further investigation, by asking for Gilmore's side of the story and construing the facts most favorably to Gilmore as required, would have disclosed that his action with Glazer—the vigorous public debate and perhaps the alleged photography—were acts fully protected by the First Amendment.

## II.   DISCUSSION

Although not particularly relevant under the circumstances of this dispute, I concede that the court accurately sets forth the elements of misdemeanor conduct under the City of Minneapolis ordinances and the Minnesota state statute. I also concede that probable cause for such offenses is factually "determined 'at the moment [an] arrest [is] made,' [and] any later developed facts are irrelevant to the probable cause analysis for an arrest." Amrine v. Brooks, 522 F.3d 823, 832 (8th Cir. 2008) (quoting United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004)).

-21-

In this case, the arrest at issue occurred at the moment the physical, wristlock custody of Gilmore commenced in The News Room restaurant. Thus, at that crucial time, defendant police officers had only facts related by the police dispatcher and those obtained during their brief encounter with Glazer on Nicollet Mall. At that point, there was neither probable cause nor "arguable" probable cause established, and any Minneapolis ordinance or state statutory verbiage to the contrary would violate Gilmore's First Amendment rights.

Officer Dubuc was informed by Gilmore that he possessed no probable cause to arrest. While probable cause is a question of law, it must be fundamentally based upon factual episodes emanating from specific unlawful actions. Here, Gilmore's heated public discussions concerning Ms. Hirsi Ali, coupled with "taking photographs" on a public street and rejecting Glazer's demand that he "walk away," were all acts fully protected by the First Amendment's Free Speech and Assembly Clauses.

In a supplemental report Officer Dubuc stated that Gilmore may have been intoxicated, was "mad" and would not communicate with him about the happenings at Nicollet Mall. Such statements were, of course, superfluous concerning the earlier arrest. Gilmore, believing he had been arrested and incarcerated in the police car without probable cause, had every right under the Fifth Amendment to remain silent. It must also be noted, as does the court itself, that Gilmore was never charged with intoxication, only disorderly conduct and obstruction of legal process.

In the face of these questions of fact and law, the court contends that the officers, even if ultimately proven wrong, are nonetheless entitled to a qualified immunity defense. The precedent of this circuit repudiates such a result.

"We review *de novo* the district court's grant of summary judgment based on qualified immunity." LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013).

-22-

And there can be no argument supportive of the idea that the Fourth Amendment permits a police officer to arrest and incarcerate a citizen without probable cause. "The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages [only] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Duffie v. City of Lincoln, No. 15-2431, 2016 WL 4435650, at *3 (8th Cir. Aug. 23, 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  And, in the face of the record and controlling constitutional law, there can be no way that a reasonable person, especially a reasonable police officer, would not have known that Gilmore's arrest was wholly unconstitutional.

"Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person [arrested] of criminal activity."  Id. at *4 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).   But, Officers Dubuc and Stewart relied solely on self-serving and incomplete statements from Glazer that did not contain information sufficient to create probable cause or even arguable probable cause to believe  that Gilmore had committed a crime–specifically "disorderly conduct" as charged.  And, had the officers reasonably sought the other side of the story as required by law, there would have been even less reason to physically accost and arrest Gilmore at dinner.  See Borgman, 646 F.3d at 523.  Accordingly, the officers are not entitled to qualified immunity.  See generally Duffie, 2016 WL 4435650, at *4-5.

The officers also charged Gilmore with obstruction of legal process, in violation of Minnesota Statute § 609.50 1(1).  This charge sheds some light on the mind set of the officers in making the disorderly conduct charge as well.

-23-

The statutory language is comprehensive, ambiguous and vague.  It has, however, been carefully cabined by the Minnesota Supreme Court in State v. Tomlin, 622 N.W.2d 546 (Minn. 2001) and State v. Pederson, 840 N.W.2d 433 (Minn. Ct. App. 2013).

The court adroitly avoids discussing this charge by hanging its "official immunity" hat solely on the disorderly conduct charge.  Ante at 9 n.7.  This was very wise because, as limited by the Minnesota Supreme Court, an arrest under the statute requires a physical act against the arresting officer or an equivalent confrontation using "fighting words."  Tomlin, 622 N.W.2d at 548.  There is, of course, not a scintilla of evidence to support this charge.  When the obstruction charge is considered in concert with the derisive and unnecessary actions–uprooting and destroying of Gilmore's political sign on Nicollet Mall–the created ambience becomes somewhat troublesome.  It also makes Gilmore's Monell claim decidedly more extant.

## III.   CONCLUSION

In epilogue, I fully recognize and concede that policing is difficult, dangerous and uncertain work.  Everyone who undertakes it should be respected.  Today its rigors are, in my view, second only to military combat duty.  So, my concerns in this case are in no way in derogation of these officers.  When mistakes occur, however, they should be rectified.

It is possible that a properly instructed jury could reach a verdict for the defendants after hearing and reviewing all the evidence at a trial.  On the other hand, a directed verdict on the issue of liability may also be the result.  In any event, I believe the magistrate judge, the first judicial officer to deal with the facts and circumstances, was correct and a trial should be conducted.

Accordingly, I respectfully dissent.

_____